**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TERENCE HAWKINS, | |
| Plaintiff, | Court No. 1:21-cv-04777 |
| v. | Hon. Robert W. Gettleman |
| CITY OF HARVEY, | JURY DEMAND |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II OF SECOND AMENDED COMPLAINT**

Dated: August 1, 2024

J. Mark Fisher
Trevor M. Jorgensen
Ari Asher
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mark.fisher@afslaw.com
trevor.jorgensen@afslaw.com
ari.asher@afslaw.com

*Counsel for Plaintiff Terence M. Hawkins*

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF ARGUMENT ................................................................... 1

II.   UNDISPUTED FACTS ........................................................................... 1

    A.    Mr. Hawkins' Employment with the City of Harvey and Injury Leave ................ 1

    B.    Mr. Hawkins' Efforts to Return from Leave to Active Duty................................ 2

    C.    City of Harvey's Investigation and Termination of Purported Ghost Payrollers ............................................................................................... 3

    D.    Mr. Hawkins First Learns of His Termination Six Months After the Fact........... 4

    E.    The Absence of Notice, Pre-Termination Hearing, and Civil Service Commission Hearing ................................................................................ 5

III.  STANDARD FOR GRANTING SUMMARY JUDGMENT ........................................... 6

IV.  ARGUMENT ...................................................................................... 7

    A.    Count I - Due Process in Violation of 42 U.S.C. § 1983 ..................................... 7

        1.    *The City Acted Under the Color of State Law in Terminating Mr. Hawkins.*.................................................................................. 7

        2.    *Mr. Hawkins Had a Protected Property Interest Entitled to Fourteenth Amendment Protection.* ................................................... 7

        3.    *The Illinois Municipal Code Entitles Mr. Hawkins to Written Notice and an Opportunity to Be Heard.* .................................................. 9

        4.    *The City Violated Mr. Hawkins' Rights.* ................................................. 10

    B.    Count II - *Monell* Claim for Municipal Liability under 42 U.S.C. § 1983.......... 13

        1.    *The City Denied Mr. Hawkins Due Process.* ........................................... 14

        2.    *The Mayor of Harvey and City Manager Initiated and Approved Mr. Hawkins' Termination.*...................................................... 15

V.    REINSTATEMENT AND DAMAGES ........................................................... 16

VI.  CONCLUSION.................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................6

*Auriemma v. Rice*,
957 F.2d 397 (7th Cir. 1992) ..............................................................13

*Beres v. Village of Huntley, Ill.*,
824 F.Supp. 763 (N.D. Ill. 1992) ........................................................11

*Blasius v. Angel Auto., Inc.*,
839 F.3d 639 (7th Cir. 2016) ...............................................................6

*Bradley v. Village of University Park, Ill.*,
59 F.4th 887 (7th Cir. 2023) ..............................................................11

*Bradley v. Village of University Park, Ill.*,
929 F.3d 875 (7th Cir. 2019) ..............................................................10

*Cairel v. Alderden*,
821 F.3d 823 (7th Cir. 2016) ...............................................................6

*Carmody v. University of Ill.*,
747 F.3d 470 (7th Cir. 2014) ..............................................................11

*Carroll v. Lynch*,
698 F.3d 561 (7th Cir. 2012) ...............................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................6

*City of Chicago v. United States Dep't of Labor*,
737 F.2d 1466 (7th Cir. 1984) ...........................................................16

*Cleveland Bd. Of Educ. v. Loudermill*,
470 U.S. 532 (1985).........................................................................10, 11

*Crull v. Sunderman*,
384 F.3d 453 (7th Cir. 2004) ...............................................................7

*Edwards v. City of Marion*,
130 Ill.App.2d 895 (1970) ...................................................................11

*Ertl v. City of De Kalb*,
    303 Ill. App. 3d 524 (1999) ..................................................................8, 14

*Hahn v. Walsh*,
    762 F.3d 617 (7th Cir. 2014) ....................................................................13

*Honaker v. Smith*,
    256 F.3d 477 (7th Cir. 2001) ......................................................................7

*Kidwell v. Eisenhauer*,
    679 F.3d 957 (7th Cir. 2012) ......................................................................7

*King v. Kramer*,
    763 F.3d 635 (7th Cir. 2014) ....................................................................13

*Kozsidy v. O'Fallon Bd. Of Fire and Police Com'rs*,
    31 Ill.App.3d 173 (1975) ..........................................................................11

*Krupa v. Quinn*,
    596 F. Supp. 3d 1127 (N.D. Ill. 2022) ........................................................7

*Kujawski v. Bd. of Commis. of Bartholomew Cnty., Ind.*,
    183 F.3d 734 (7th Cir.1999) ....................................................................13

*McCauley v. City of Chi.*,
    671 F.3d 611 (7th Cir. 2011) ....................................................................13

*Memphis Community School Dist. v. Stachura*,
    477 U.S. 299 (1986)..................................................................................16

*Misek v. City of Chi.*,
    783 F.2d 98 (7th Cir. 1986) ........................................................................8

*Modrowski v. Pigatto*,
    712 F.3d 1166 (7th Cir. 2013) ....................................................................6

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978)..........................................................................13, 18

*Pembaur v. Cincinnati*,
    475 U.S. 469 (1986)..................................................................................14

*Rasche v. Village of Beecher*,
    336 F.3d 588 (7th Cir. 2003) ....................................................................13

*Schultz v. Baumgart*,
    738 F.2d 231 (7th Cir. 1984) ....................................................................10

*Scott v. Harris*,
  550 U.S. 372 (2007)....................................................................................6

*Selmani v. Vill. of Bartlett*,
  515 F. Supp. 3d 882 (N.D. Ill. 2021) .......................................................8

*Spring-Weber v. City of Chicago*,
  No. 16 C 8097, 2017 WL 1316267 (N.D. Ill. Apr. 10, 2017)...................8

*Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*,
  143 F.3d 351 (7th Cir. 1998) .....................................................................7

*Valentino v. Vill. of S. Chicago Heights*,
  575 F.3d 664 (7th Cir. 2009) ...................................................................14

*Vela v. Vill. of Sauk Vill.*,
  218 F.3d 661 (7th Cir. 2000) ...................................................................14

*Waters v. City of Chicago*,
  580 F.3d 575 (7th Cir. 2009) ...................................................................13

**Statutes**

65 ILCS § 5/10-1-1 ........................................................................................9

65 ILCS § 5/10-1-18 ...............................................................................8, 9, 10

65 ILCS § 5/10-2.1-1 .....................................................................................9

65 ILCS § 5/10-2.1-17 ...............................................................................8, 10

42 U.S.C. § 1983.................................................................................5, 7, 13, 18

Harvey Mun. Code § 2-32-030 ..................................................................8, 9, 12

Harvey Mun. Code § 2-32-200 ........................................................................9

Harvey Mun. Code § 2-48-010 .....................................................................8, 9

Illinois Municipal Code Article 10 (65 ILCS 5/10)..................................8, 9

Illinois Public Employees Disability Act, 5 ILCS 345/0.01, *et seq.*...............2

**Other Authorities**

Fed. R. Civ. P. 56(a) ......................................................................................6

U.S. Const. Amend. XIV ............................................................................7, 8

## I.    SUMMARY OF ARGUMENT[1]

Plaintiff is entitled to summary judgment on Counts I and II of the Second Amended Complaint herein (the "Complaint") against the City of Harvey, Illinois ("Defendant" or the "City") because the City unlawfully terminated Mr. Hawkins and deprived him of his property interest in his civil service employment as a Civil Service Sergeant in the City's Police Department without the due process required by the Constitution, Illinois statues, the City's municipal code, and the City's collective bargaining agreement.  The City broke the law by:

- never giving him written notice of grounds for termination,

- never giving him a pre-termination hearing, and

- never allowing redress to a civil service commission required by Illinois statutes.

As more fully set forth below, Plaintiff is entitled to reinstatement as a Sergeant with appropriate duties, damages subject to mathematical calculation by the court for lost back pay, out of pocket health insurance cost, and reinstatement or monetization of accrued leave days as well as additional damages to be established at a prove-up hearing.

## II.    UNDISPUTED FACTS

### A.    Mr. Hawkins' Employment with the City of Harvey and Injury Leave

Mr. Hawkins was hired as a patrolman by the City of Harvey in 2008.  (SUF, ¶ 1).  On May 1, 2013, Mr. Hawkins was promoted to Civil Service Sergeant.  (SUF, ¶ 2).  As a sergeant, he was entitled to participate in the Harvey Police Pension Fund (the "Pension Fund") by contributing 9.91% of his salary to the Pension Fund.  (SUF, ¶ 3).

---

[1] Plaintiff also submits Plaintiff's Statement of Undisputed Facts in Support of His Motion for Summary Judgment ("SUF"), and Plaintiff's Appendix of Exhibits Referred to in Statement of Uncontested Facts Regarding His Motion For Partial Summary Judgment ("Exhibits") filed herewith.

On March 17, 2018, after over ten years of service, Mr. Hawkins injured his left knee while on duty, when exiting his patrol car. (SUF, ¶ 4). Mr. Hawkins notified the following shift supervisor of his injury so that supervisor could process an injury report, and beginning April 5, 2018, began using earned sick leave. (SUF, ¶¶ 5, 6). He received initial medical treatment and was instructed by his primary care doctor not to return to work until he completed an MRI. (SUF ¶ 7). After the MRI, Mr. Hawkins remained at home to rest his injured knee in accordance with his doctor's orders. (SUF, ¶ 8). He was placed on leave and received payment pursuant to the Illinois Public Employees Disability Act, 5 ILCS 345/0.01, *et seq*., because he was unable to perform his duties due to injury on the job. (SUF, ¶¶ 9, 10). He was paid at his then-current salary of $2,969.63 per bi-weekly pay period and $77,210.35 annually, through May 17, 2019. *Id.* However, the City applied his paid sick leave, holiday leave, and personal time to his absence from April 5 until November 28, 2018. (SUF, ¶ 11). His last check was $2,969.60 for the bi-weekly pay period May 4, 2019 through May 17, 2019. (SUF, ¶ 9).

During this time, Mr. Hawkins reported frequently to Sergeant Kirkwood regarding his status, condition, and ability to return to active duty. (SUF, ¶ 12). Sergeant Kirkwood was appointed his supervisor during his leave. *Id.* Mr. Hawkins was depressed about not being able to work, a condition that was deepened by the prescribed pain management medication. (SUF, ¶ 13). His condition improved from rest at home. *Id.*

B.     Mr. Hawkins' Efforts to Return from Leave to Active Duty.

Once Mr. Hawkins' condition improved sufficiently by Spring 2019, he contacted the City's new Chief of Police, Eddie Winters, about opportunities to return to active duty with appropriate limitations for his condition. (SUF, ¶ 14). Mr. Hawkins was not selected for one newly created position that he sought in Spring 2019. (SUF, ¶ 15). Mr. Hawkins then maintained his contact with the Chief and Kirkwood, who encouraged his efforts to return to active duty.

2

(SUF, ¶ 15).  Mr. Hawkins obtained a certificate from his doctor that he could return to work on restricted duty on July 8, 2019.  (SUF, ¶ 24).  Mr. Hawkins provided this information to the Harvey Police Department and was nonetheless told by Sergeant Tibbs of the Internal Affairs Division that he had to be cleared for unrestricted duty.  (SUF, ¶ 25).

At an October 8, 2019 follow-up meeting with the Chief and his assistant, the Chief and Mr. Hawkins targeted October 14, 2019 for Mr. Hawkins' return to active duty.  (SUF, ¶ 26). However, Mr. Hawkins learned from Tibbs that his doctor's clearance to work without restriction was not sufficient, and that Mr. Hawkins needed a "fit for duty" certification that had to be ordered by the City from Ingalls Hospital, the only provider recognized by the City.  (SUF, ¶ 27).  The City was to schedule the appointment and advise Mr. Hawkins.  *Id.*

When Mr. Hawkins had not received notice of an appointment for his fit for duty test, on December 12, 2019, he emailed Chief Winters to ask when he could return to work.  (SUF, ¶¶ 28, 29).  Chief Winters engaged Erica Kimble, the City's Director of Human Resources, in the process on December 13, 2019, stating he was "of the understanding that a fitness for duty was the only thing holding [Mr. Hawkins] up."  (SUF, ¶ 30).  Ms. Kimble met with Mr. Hawkins and ordered the fit for duty test, but it was delayed because Ingalls Hospital refused to perform any medical services for the City until it paid its bills.  (SUF, ¶¶ 31,32).  Mr. Hawkins was finally scheduled for the examination and was certified by Ingalls as fit for duty on January 2, 2020.  (SUF, ¶ 33).

Little did Mr. Hawkins know, but he had been terminated without any notice from the City months before, on June 2 – in the middle of the saga of his attempted return to active duty.  (SUF, ¶ 37).

C.    City of Harvey's Investigation and Termination of Purported Ghost Payrollers

After a new mayor of the City of Harvey was elected in 2019, the new administration did a ghost payroller audit in May 2019 to identify and terminate persons on the payroll that were not

working. (SUF, ¶ 16). To conduct the audit, the Mayor's Chief of Staff, Corean Davis, provided Ms. Kimble a list of all City employees. (SUF, ¶ 17). The City departments were tasked with instructing employees to pick up their next payroll check from the Human Resources department at City Hall. *Id.* Suzanne Swanigan, who was a human resources generalist at the time, recorded the names of the employees who picked up their checks, and then provided Ms. Kimble with the uncollected checks and the list she created marking who picked up their checks and who did not. (SUF, ¶ 18). Mr. Hawkins was on the list as a person with an uncollected check. (SUF, ¶ 19). Ms. Kimble reviewed the list and recommended to both the Mayor and Mr. Williams the termination of employees who did not pick up their checks. *Id.* The Mayor and Williams approved the termination of 8 to 10 people based on the list provided by Kimble. *Id.* Mr. Hawkins was terminated because he was on the list of employees who had not picked up their checks. *Id.*

### D. Mr. Hawkins First Learns of His Termination Six Months After the Fact.

Mr. Hawkins knew nothing about this ghost payroller investigation or even, until much later, that he was terminated at all. He did not receive any written notice of investigation of him as a ghost payroller or that his job was at risk because he failed to pick up a payroll check on time. (SUF, ¶ 38). Instead, Mr. Hawkins only received a phone call from a fellow patrolman in the City of Harvey Police Department to inform him that he had to pick up his paycheck at City Hall rather than from Police Headquarters. (SUF, ¶ 21). The patrolman gave no explanation for this change in procedure. *Id.*

When Mr. Hawkins went to City Hall to pick up his check, the City's Director of Human Resources, Ms. Kimble, told him that she did not have his check because it had been returned to Police Headquarters. (SUF, ¶ 22). He never received that check or any other bi-weekly pay checks from the City of Harvey after the check for the pay period ending May 17, 2019. (SUF, ¶ 23). He

believed that the issues with his pay would be worked out when his ongoing contacts with Chief Winters allowed him to return to active duty.  *Id.*

On February 21, 2020, over a month after he was certified as fit for duty, Mr. Hawkins met with City Administrator Timothy Williams and Ms. Kimble and was inquiring about his return status when Ms. Kimble relayed that the City had "fired [him] a long time ago."  (SUF, ¶ 35).  On February 24, 2020, the City updated Mr. Hawkins employment records to reflect that Mr. Hawkins was "terminated for cause" and stated the date of termination was June 2, 2019 — over eight months earlier.  (SUF, ¶ 36).

E.      <u>The Absence of Notice, Pre-Termination Hearing, and Civil Service Commission Hearing</u>

Mr. Hawkins never received written notice of his termination.  (SUF, ¶ 38).  He never received a notice of termination or that his job was at risk if he did not return to work.  *Id.*  He never received a pre-disciplinary hearing at which he could defend himself.  (SUF, ¶ 39).

 The City did not use different procedures for the termination of civil servants than for the terminations of other non-civil service employees.  (SUF, ¶ 41).  During the applicable period, the City did not maintain a civil service board, police board, or civil service commission that conducted hearings in connection with the termination of civil service employees.  (SUF, ¶ 42).

The City did not maintain a Civil Service Commission during 2018 and 2019, so Mr. Hawkins had no redress through a hearing before that commission, as provided in the collective bargaining agreement between the City and Mr. Hawkins' union that was in effect at the time.  (SUF, ¶ 42).

Mr. Hawkins filed suit on September 8, 2021.  Mr. Hawkins filed the operative Second Amended Complaint on October 19, 2023.  The City filed its answer on November 17, 2023.  Plaintiff now moves for partial summary judgment on his claims pursuant to 42 U.S.C. § 1983.

## III.    STANDARD FOR GRANTING SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The underlying substantive law governs whether a factual dispute is material; irrelevant or unnecessary factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (*quoting Anderson*, 477 U.S. at 248).  In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, "the nonmoving party . . . [but] only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (*citing Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)).  After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted).  Summary judgment is warranted when

6

the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

IV.     **ARGUMENT**

    A.     <u>Count I - Due Process in Violation of 42 U.S.C. § 1983</u>

Mr. Hawkins is entitled to summary judgment on Count I of the Complaint which alleges a claim under 42 U.S.C. § 1983. Under this statute, a plaintiff must prove two things: (1) that the defendant was acting under the color of state law, and (2) that his conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 355 (7th Cir. 1998). The Fourteenth Amendment prohibits local governments from depriving a person of property without due process of law. U.S. Const. Amend. XIV.

        1.     *The City Acted Under the Color of State Law in Terminating Mr. Hawkins.*

The City acted under the color of state law and violated Mr. Hawkins' rights under 42 U.S.C. § 1983 when it terminated his civil service employment without notice and due process. *See Krupa v. Quinn*, 596 F. Supp. 3d 1127, 1135 (N.D. Ill. 2022) ("To qualify as conduct under color of law," an action must be fairly "attributable to the State."); *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001) ("Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.") (quotations omitted).

        2.     *Mr. Hawkins Had a Protected Property Interest Entitled to Fourteenth Amendment Protection.*

Mr. Hawkins was a Civil Service Sergeant with a protected property interest in employment. Such an interest can arise from a state statute, regulation, municipal ordinance, or an express or implied contract. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004). Mr.

Hawkins retained a property interest in his continued civil service employment under the laws of the State of Illinois, the City of Harvey Municipal Code, and the applicable collective bargaining agreement, and the right to due process if the City wanted to terminate him.  The language of the two applicable Illinois statutes is clear — a police officer or civil service officer shall not be removed or discharged "except for cause, upon written charges, and after an opportunity to be heard in his own defense."  65 Ill. Comp. Stat. Ann. 5/10-2.1-17 (2007);65 Ill. Comp. Stat. Ann. 5/10-1-18.  The case law uniformly vindicates civil servants' protectable property interest in their employment.  *Ertl v. City of De Kalb*, 303 Ill. App. 3d 524, 525 (1999) (The Illinois Municipal Code (65 ILCS § 5/10-2.1-17) provides such officers "with a property interest in their jobs."); *Selmani v. Vill. of Bartlett*, 515 F. Supp. 3d 882, 887 (N.D. Ill. 2021) (the plaintiff "alleged a property interest stemming from the Illinois statute" [65 Ill. Comp. Stat. Ann. § 5/10–2.1–17]); *Spring-Weber v. City of Chicago*, No. 16 C 8097, 2017 WL 1316267, at *5 (N.D. Ill. Apr. 10, 2017) (fire paramedic placed on involuntary medical leave had property interest in employment under 65 Ill. Comp. Stat. Ann. § 5/10-2.1-17 despite statute's failure to mention suspension or leave); *Misek v. City of Chicago*, 783 F.2d 98 (7th Cir. 1986) (65 Ill. Comp. Stat. Ann. 5/10-1-18 provides civil service employee Fourteenth Amendment property interest in continuing employment).  The City has recognized its obligation to follow these rules in its Municipal Code and in the CBA.[2]

---

[2] *See* Harvey Mun. Code § 2-32-030 (Chief of Police has authority to discharge, suspend or transfer employees "in accordance with the civil service commission rules and regulations and applicable collective bargaining agreements"); Harvey Mun. Code § 2-48-010 (all positions of employment within the City of Harvey, except for those specifically excepted, "shall be made subject to the jurisdiction of the civil service commission"); *CBA* (Exh. E), sec. 7.5, TH 000012 (stating disciplined sergeants will be entitled to procedures of Civil Service Commission (as laid out in 65 Ill. Comp. Stat. Ann. 5/10-1-18) or 65 Ill. Comp. Stat. Ann. 5/10-2.1-17).

3.      *The Illinois Municipal Code Entitles Mr. Hawkins to Written Notice and an Opportunity to Be Heard.*

Article 10 of the Illinois Municipal Code (65 Ill. Comp. Stat. Ann. § 5/10) establishes the requirements of municipalities with respect to employees and employment.  Municipalities must provide due process to their police officer employees through either a Civil Service Commission (as described in Division 1 of Article 10, 65 Ill. Comp. Stat. Ann. § 5/10-1-1, *et seq.*) or a Board of Fire and Police Commissioners (as described in Division 2.1 of Article 10, 65 Ill. Comp. Stat. Ann. § 5/10-2.1-1, *et seq.*).  *See* 65 Ill. Comp. Stat. Ann. 5/10-2.1-1 ("[i]n every municipality with a population of at least 5,000 and not more than 250,000 which is not subject to Division 1 of this Article . . . the mayor of the city, with the consent of the city council . . . shall appoint a board of fire and police commissioners); 65 Ill. Comp. Stat. Ann. § 5/10-1-1 ("[t]he mayor of each municipality which adopts this Division 1 as hereinafter provided shall . . . appoint 3 persons, who shall constitute and be known as the civil service commissioners of such municipality").  The City of Harvey has adopted a Civil Service Commission to provide due process to City employees.  *See* Harvey Mun. Code § 2-48-010 (all positions within the City of Harvey, except for those specifically excepted, "shall be made subject to the jurisdiction of the civil service commission"); Harvey Mun. Code § 2-32-030 (chief of police has the power and duty to appoint, discharge, suspend or transfer employees of the police department "in accordance with the civil service commission rules and regulations and applicable collective bargaining agreements"); Harvey Mun. Code § 2-32-200 (discharge of police officers from uniformed service "shall be in conformance with the rules of conduct established in . . . the civil service commission rules and statutes and applicable collective bargaining agreements").

The Civil Service Commission code requires that "[n]o officer or employee of a police ... department in the classified civil service of any municipality having 500,000 or fewer inhabitants

. . . may be removed or discharged . . . except for cause upon written charges and after an opportunity to be heard in his own defense."  65 Ill. Comp. Stat. Ann. § 5/10-1-18(b).  The opportunity to be heard must come from (i) the process described in the Civil Service Commission rules, or (ii) an "alternative or supplemental form of due process based upon impartial arbitration as a term of a collective bargaining agreement."  *Id*.  The applicable Collective Bargaining Agreement between the City of Harvey and the union representing the City's police sergeants offers sergeants the right to have their disciplinary charges, including removal or discharge, heard before the Civil Service Commission or a neutral arbitrator adopting the rules of 65 Ill. Comp. Stat. Ann. § 5/10-2.1-17, the Board of Fire and Police Commissioners.  (Exhibit E; CBA, section 7.5(A), at TH 000012-13). 65 Ill. Comp. Stat. Ann. § 5/10-2.1-17 requires the same:  an officer or member of the fire department may not be removed or discharged "except for cause, upon written charges, and after an opportunity to be heard in his own defense."

The Civil Service Commission hearing process requires that before an employee is removed or discharged, the charges against him be investigated by the Civil Service Commission or an "officer or board" appointed by the Commission, the employee be advised of the charges and his right to an attorney, and the employee be given an opportunity to defend against the charges. 65 Ill. Comp. Stat. Ann. § 5/10-1-18(b).  After the hearing, a "complete transcript" of the hearing must be made available to the employee "without charge and without delay."  *Id.*

    4.    *The City Violated Mr. Hawkins' Rights.*

The City violated his rights when it terminated Mr. Hawkins' civil service employment without notice and other due process.  *See Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985) (finding civil employee "possessed property rights in continued employment," and as such should have been afforded written notice and a hearing). The Supreme Court held in *Loudermill* that civil servants are Constitutionally entitled to due process in the form of "some

kind of a hearing" prior to discharge. *Loudermill*, 470 U.S. at 542. The Seventh Circuit has enumerated the pre-termination due process that Mr. Hawkins should have – but did not – receive: a statement of reasons for the deprivation, and an opportunity to respond. *Bradley v. Vill. of Univ. Park, Ill.*, 929 F.3d 875, 882 (7th Cir. 2019); *see also Schultz v. Baumgart*, 738 F.2d 231, 236 (7th Cir. 1984) ("If [plaintiff] received prior notice of termination and had a meaningful opportunity to respond prior to termination, either through the union grievance process or before the commission, then constitutional requirements would presumably have been satisfied. On the other hand, if [defendant] summarily fired [plaintiff], affording him neither prior notice nor an opportunity to respond, due process would have been violated"). The "root requirement" of the Due Process Clause is a pre-termination hearing, which reflects the "severity of depriving a person of the means of livelihood." *Loudermill*, 470 U.S. at 542-43. Even with robust post-termination protections, an opportunity to be heard before removal is "critical." *Carmody v. Univ. of Ill.*, 747 F.3d 470, 475 (7th Cir. 2014).

It is undisputed that the City failed to provide Mr. Hawkins with written charges or an opportunity to be heard. The City's failure to provide written charges and an opportunity to a pre-termination hearing makes his termination unlawful and invalid. *See Beres v. Vill. of Huntley, Ill.*, 824 F.Supp. 763, 767 (N.D. Ill. 1992) (". . . termination of a municipal police officer is not an unsettled area of state law because the Code specifically sets forth the procedures for termination of a municipal police officer"); *Kozsidy v. O'Fallon Bd. Of Fire and Police Comm'rs*, 31 Ill. App. 3d 173 (1975) (failure to file written charges against municipal policeman who allegedly violated oral grooming regulation constituted jurisdictional defect, rendering dismissal of policeman void); *Edwards v. City of Marion*, 130 Ill. App. 2d 895 (1970) (discharge was ineffective where no charges were filed, and no hearing was held prior to discharge of city police chief); *Bradley v. Vill.*

*of University Park, Ill.*, 59 F.4th 887, 902 (7th Cir. 2023) (granting summary judgment for plaintiff-police chief on § 1983 due process claim where plaintiff 'received no process at all' before termination of his public employment).

Moreover, the City is obligated to follow its own policies and rules when terminating an employee. The Harvey Municipal Code provides that the Chief of Police, under the direction of the Mayor, may discharge, suspend, or transfer police department employees, subject to "the civil service commission rules and regulations and applicable collective bargaining agreements." Harvey Mun. Code § 2-32-030. The applicable collective bargaining agreement in place expressly states that when non-probationary employees are terminated, the "recommendation, along with the supporting allegations or reasons therefore, shall be submitted in writing to the employee." (Exh. E; CBA, section 7.8, at TH 000013. Further, in its deposition, the City explained that when a Civil Service employee is terminated, the City must follow a specific process: "the process is a predisciplinary meeting where the employee is presented with a list of charges, and then they will speak to those charges and then a decision is made after that." (Exh. D, City Dep., 69:1-4.) The City testified that Mr. Hawkins was not provided with any notices prior to or after his termination, (Exh. D, City Dep., 74:9-15), and that there was no requisite predisciplinary meeting (*id.* at 74:16-20). Then-Director of Human Resources Erica Kimble confirmed the same. (Exh. Q, Kimble Affidavit, ¶ 10 ("No hearings were held in connection with Mr. Hawkins' termination"). Mr. Hawkins still has never received a written notice of his termination. (Exh. A, Hawkins Dep., 97:9-15).

Mr. Hawkins did not receive an opportunity to be heard by a Civil Service Commission, which is, at the civil servant's option, the preferred forum for redress even if a grievance procedure

existed.  At the time, the City had no civil service commission or police board that conducted hearing regarding termination of civil servants.  (Exh. Q, Kimble Aff., ¶ 7).

The undisputed facts demonstrate that the City, acting under the color of state law, terminated Mr. Hawkins without providing him notice or an opportunity to be heard, and thus, Mr. Hawkins requests the Court grant summary judgment as to this claim under Count I of the Complaint.

B.      Count II - *Monell* Claim for Municipal Liability under 42 U.S.C. § 1983.

Mr. Hawkins is entitled to summary judgment on Count II of the Complaint which alleges a claim under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  To establish a *Monell* claim against the City, Mr. Hawkins must prove: (1) he has suffered the deprivation of a constitutional right; and (2) an official custom or policy of defendant caused that deprivation.  *See McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011); *Monell, supra,* 436 U.S. at 690.  A plaintiff may establish the existence of an official policy or custom in several ways. The plaintiff may identify an express policy responsible for the alleged constitutional injury.  *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014).  Alternatively, a plaintiff may establish a widespread practice attributable to the municipality or private entity "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned misconduct of subordinate officers." *Hahn v. Walsh*, 762 F.3d 617, 636 (7th Cir. 2014). "The plaintiff may also assert that the individual who committed the constitutional deprivation was an official with policy-making authority." *King*, 763 F.3d at 649.

To establish municipal liability due to a constitutional deprivation committed by an official with policy-making authority, a plaintiff must "present evidence that his constitutional injury was caused by an individual with final policymaking authority with respect to the subject matter in

question." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). Generally, for purposes of Section 1983, "the policymaking authority in the city structure will be the city council, or . . . the Board of Trustees." *Rasche v. Village of Beecher*, 336 F.3d 588, 601 (7th Cir. 2003). However, final policymaking authority "may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Bd. of Comm'r. of Bartholomew Cnty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999); *see also Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992) (defining "policy" as either "legislative power" over a jurisdiction or "executive power" to take final action in the name of the jurisdiction).

The factors to determine whether an official is considered a final decisionmaker include: "(1) whether the official is constrained by policies of other officials or legislative bodies, (2) whether the official's decision on the issue in question is subject to meaningful review, and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009). Additionally, in order to establish a policy, the decision "to follow a course of action must be 'deliberate.'" *Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 665–66 (7th Cir. 2000) (*quoting Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)).

1.    *The City Denied Mr. Hawkins Due Process.*

Mr. Hawkins was deprived of his due process rights and property interests when he was terminated from his position as a Civil Service Sergeant. *Supra* II.A. This was the direct result of *a policy determination made directly by the Mayor*, an official with policy-making authority, to conduct a ghost payroll audit and to terminate Mr. Hawkins without written notice or the opportunity to be heard. (SUF, ¶¶ 16-19, 35). It was implemented by the Director of Human Resources, Erica Kimble, with direction from and in consultation with the Mayor and the City Administrator, Tim Williams. (SUF, ¶¶ 16-19). The uncontradicted admissible evidence

establishes that Mr. Hawkins — along with at least seven other individuals — was terminated from his position with the City of Harvey through a "ghost payroll audit." (SUF, ¶ 19). The City acknowledged the ghost payroll audit was a process where the City "signed people out to get their checks, and then they gave us onboarding documents to start new files." (*See* Exh. D, City Dep., 29:16-30:6; 34:20-35:3). Moreover, there are numerous admissions in the record by the City that a ghost payroll audit was conducted. *See, e.g.*, Exh. M, *City of Harvey EEOC Position Statement* (hereinafter "Position Statement), at COH 000004 ("In May 2019, a new mayor was elected, and the new administration did a ghost payroller audit. Mr. Hawkins was one of the people identified as being paid while not working, so the City Council terminated him, along with the other ghost payrollers, and stopped paying him in late May 2019."); *id.* at COH 000004 ("Mr. Hawkins was terminated by the City Council for reasons completely unrelated to his age or any alleged disability. On June 2, 2019, like others identified in this audit, Mr. Hawkins was terminated from the City's payroll."); *id.* at COH 000010 ("Further, the City Council had no information at all about any alleged disability of Mr. Hawkins when he was terminated as a ghost payroller, and Mr. Hawkins cannot establish that he was 'disabled' as of the June date when his termination became effective."); Exh. B, Swanigan Affidavit before EEOC, at COH 000014 ("In May 2019, my former supervisor, Erica Kimble, the former Director of Human Resources, conducted an audit of the City payroll looking for 'ghost payrollers,' i.e. persons who were getting paid but were not doing work. As I recall it, it was in connection with that audit that Ms. Kimble instructed me to terminate him from the payroll system."); Exh. D, City Dep., 37:15-24 (acknowledging that a ghost payroll audit occurred and was done at the direction of the Mayor and City Administrator).

        2.    *The Mayor of Harvey and City Manager Initiated and Approved Mr. Hawkins' Termination.*

There is direct evidence that the Mayor, a municipal agent with final policy making authority, *initiated and approved* the ghost payroll audit and Mr. Hawkins' termination. (SUF, ¶¶ 16-17, 19). The record makes clear that the Mayor has "a say" in decisions regarding hiring and firing. (Exh. D, City Dep., 24:5-8). Moreover, Ms. Kimble explained that "the Mayor and [City Manager] Williams directed me to conduct a ghost payroll audit. They stated that the City had excessive workers' compensation and payroll costs for employees that were on leaves of absence, workers' compensation or were not coming to work for other reasons. This was the subject of several meetings between me, the Mayor, Davis, and Williams. The Mayor and Williams approved all terminations following the ghost payroll audit at these meetings." (Exh. Q, Kimble Affidavit, ¶ 8). Ms. Kimble provided a detailed account of how the ghost payroll audit worked, and how the Mayor himself initiated the process. (*Id.* at ¶ 9).

The undisputed facts demonstrate that the Mayor, a City official, within the scope of his authority, set forth a ghost payroll audit that deprived Mr. Hawkins of his property interest in his employment as a Civil Service Sergeant, and thus, Mr. Hawkins requests the Court grant summary judgment as to Count II.

## V. REINSTATEMENT AND DAMAGES

The remedy for the denial of due process is clearly defined in the caselaw. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306-307 (1986) ("the basic purpose of § 1983 damages is 'to compensate persons for injuries that are caused by the deprivation of constitutional rights'" and may include not only out-of-pocket loss and other monetary harms, but also impairment of reputation, personal humiliation, and mental anguish and suffering); *City of Chicago v. United States Dep't of Labor*, 737 F.2d 1466, 1473 (7th Cir. 1984) (back pay is an appropriate "make whole" remedy where plaintiff would have been employed had he received the pretermination procedures to which he was entitled).

Mr. Hawkins' termination is void and he is entitled to reinstatement to a position of employment at a rank restoring his membership in the Pension Fund and with duties, responsibilities, benefits and rights to that which Plaintiff would have had if not for his unlawful termination.

The following table summarizes the damages calculable by the Court based on the current record through July 2024, with the supporting methodology on the attached Schedules:

| Category of Damages | Recovery | $ Amount | Quantity | Schedule |
|---|---|---|---|---|
| Retroactive Raise on Paid Salary | Damages | $ 2,080.60 | 26 pay periods @ $74.24; 1 pay period @ $150.34 | 1 |
| Post-Termination Back Pay | Damages | $ 418,075.98 | 136 pay periods @ $3,119.97 | 2 |
| Replacement Health Insurance | Damages | $ 1,876.74 | 62 Months @ $30.27 | 3 |
| Leave Deducted by City in 2018 | Reinstatement or Damages | $ 114,398.90 | 220 Days Leave @ $520 | 4 |
| Accrued 2019 - 2023 Post-Termination Leave | Damages | $ 54,599.48 | 105 Days Leave @ $520 | 5 |
| Accrued 2024 Post-Termination Leave | Reinstatement or Damages | $ 26,519.75 | 51 Days Leave @ $520 | 6 |

These damages continue to accrue until Mr. Hawkins is reinstated to active duty at the rate indicted above and in the schedules.

Although the City tried to do away with the rank of Civil Service Sergeant, on March 12, 2024, the Illinois Labor Relations Board reinstated the rank of Civil Service Sergeant, restored the rank of demoted sergeants still employed by the Harvey Police Force, and required two 2.5% retroactive pay increases on May 1, 2018, and May 1, 2019.  (SUF, ¶ 43).  Mr. Hawkins is entitled to the same relief.

First, Mr. Hawkins is entitled to $2,080.60 in retroactive pay increases on salary previously paid to him between May 1, 2018 and May 17, 2019, as set forth on Schedule 1 (SUF, ¶ 9).  It is calculated based on the first 2.5% retroactive pay increase awarded by the Illinois Labor Relations

Board that equals $74.59 for each of Mr. Hawkins' $2,969.63 bi-weekly salary payments that he received for the period beginning May 5, 2018 through April 20, 2019 and the second 2.5% retroactive pay increase awarded by the Illinois Labor Relations Board for the last pay period beginning May 4, 2019. (SUF, ¶ 43).

Second, Mr. Hawkins is entitled to recover his back pay during the period since his termination, including all pay raises and improvements in benefits offered to other police officers employed by the City. The total amount of Mr. Hawkins' back pay through the end of July 2024 is $418,075.98. As set forth on attached Schedule 2, this element of damages is calculated at a rate of $3,119.97 for each bi-weekly pay period beginning on May 18, 2019 through the pay period beginning on July 30, 2024 after giving effect to the May 1, 2018 and May 1, 2019 retroactive pay increases ordered by the Illinois Labor Relations Board (SUF, ¶ 43) (*See* Schedule 2). Mr. Hawkins' total back pay damages of $418,075.98 as of July 30, 2024 will increase by $3,119.97 for each bi-weekly pay period after July 30, 2024 until he is reinstated.

Third, because of his unlawful termination, Mr. Hawkins lost his health insurance benefits so that his wife was forced to pay $121 per month to obtain coverage for him, which was $30.27 more than the $90.73 deducted from Mr. Hawkins' bi-weekly salary. (SUF, ¶ 44). The total cost of $1,876.74 incurred by Plaintiff through July 2024 is calculated on attached Schedule 3. This element of Mr. Hawkins' damages also continues to accrue until he is reinstated.

Fourth, Mr. Hawkins is entitled to reinstatement or damages for the leave days that the City improperly charged against his leave account balance of 200 sick days, 19 holiday days, and 1 day of personal time between April 5 and November 28, 2018. (SUF, ¶ 11). These should be reinstated or added to Mr. Hawkins' damages in the amount of $114,398.90, valued at $520.00 per leave day

(based on a schedule in which Sergeants worked six 12-hour shifts per pay period). (SUF, ¶ 45). The calculation of this component of damages is set forth on <u>Schedule 4</u>.

Fifth, because of his unlawful termination, Mr. Hawkins is entitled to damages of $54,599.48 for 105 days of vacation leave to which Mr. Hawkins would have been entitled under the CBA during 2019 through 2023, determined by the Current Pay Rate, which we calculate to be $520.00 per leave day (based on a schedule in which Sergeants worked six 12-hour shifts per pay period). (SUF, ¶¶ 45, 46). The calculation of this component of damages is set forth on <u>Schedule 5</u>.

Sixth, because of his unlawful termination, Mr. Hawkins is entitled to either (i) reinstatement for the following leave days that would have accrued in 2024: 25 days of vacation leave, 12 sick leave days, 10 longevity leave days, and 4 personal leave days to which Mr. Hawkins would have been entitled during 2024 or, (ii) if he is not reinstated during 2024, damages of $26,519.75 for those days determined by the Current Pay Rate, which we calculate to be $520.00 per leave day (based on a schedule in which Sergeants worked six 12-hour shifts per pay period). (SUF, ¶¶ 45, 46). The calculation of this component of damages is set forth on <u>Schedule 6</u>.

Finally, although these damages can be and should be calculated and awarded by the Court, Mr. Hawkins requests, if the Court grants summary judgment on liability, that it also schedule a prove-up hearing for other damages needed to compensate him for the physical and psychological harm suffered as a result of the manner in which he was denied notice, delayed receiving diagnostic treatment and evaluations at the City's only approved provider, led on to believe that he was on leave and only needed a medical approval or reinstatement, and was then blindsided by the news that he had been fired 8 months earlier while working through the process with several City officials to return to active duty.

19

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff Terence Hawkins requests this Court grant his partial motion for summary judgment as to his claims under 42 U.S.C. § 1983 and *Monell,* and the damages that can be mathematically calculated by the Court and set a prove-up hearing for the additional damages referred to above.


Dated: August 1, 2024                              Respectfully submitted,

                                                   /s/ J. Mark Fisher
                                                   J. Mark Fisher
                                                   Trevor M. Jorgensen
                                                   Ari Asher
                                                   ARENTFOX SCHIFF LLP
                                                   233 South Wacker Drive
                                                   Suite 7100
                                                   Chicago, IL 60606
                                                   Telephone: (312) 258-5500
                                                   Facsimile: (312) 258-5600
                                                   mark.fisher@afslaw.com
                                                   trevor.jorgensen@afslaw.com
                                                   ari.asher@afslaw.com

                                                   *Counsel for Plaintiff Terence M. Hawkins*