IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TERENCE HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 04777 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| CITY OF HARVEY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Terence Hawkins worked as a police officer for the City of Harvey ("defendant" or the "City"). Plaintiff has sued defendant, alleging that it violated his rights by taking adverse employment actions against him. According to plaintiff's complaint, after roughly a decade on the job and at the age of 56, he injured his knee while on duty exiting his patrol car and was placed on leave of absence. He alleges that defendant thereafter repeatedly denied him the opportunity to return to work and surreptitiously terminated him based on his age and injury. He asserts four counts in the complaint: a federal claim under 42 U.S.C. § 1983 for violating his Due Process Rights under the Fourteenth Amendment (Count I); a <u>Monell</u> claim (Count II); a claim under 29 U.S.C § 621, <u>et seq.</u>, for violating the Age Discrimination in Employment Act ("ADEA") (Count III); and a claim under 42 U.S.C. § 12101, <u>et seq.</u>, for violating the Americans with Disabilities Act ("ADA") (Count IV). He seeks back pay, lost benefits, reinstatement, and compensatory damages.

Plaintiff has moved for partial summary judgment on Counts I and II. Defendant has cross-moved for summary judgment on those same counts and has also moved for summary judgment on Counts III and IV. For the reasons below, the court grants plaintiff's motion for

summary judgment as to liability on Count I and Count II, denies defendant's cross-motion for summary judgment on those counts, and grants defendant's motion for summary judgment on Count III and Count IV.

## **BACKGROUND**

In 2008, defendant hired plaintiff as a patrolman for the Harvey Police Department ("HPD"). In May 2013, plaintiff was promoted to Civil Service Sergeant.

In March 2018, plaintiff injured his left knee while on duty exiting his patrol car. Upon his return to the police station, he notified the shift supervisor—Sergeant Kirkwood—of his injury. Plaintiff filled out an injury report form and submitted it to Sergeant Kirkwood. At some point between March 17 and April 1, 2018, plaintiff also informed a Sergeant Nevers of his injury.

In April 2018, he communicated with Deputy Chief Patterson about his injury and began using earned sick leave. He received initial medical treatment and was instructed by his primary care doctor not to return to work until he completed an MRI. He was placed on leave and, because he was unable to perform his duties due to injury on the job, he received payment under the Illinois Public Employees Disability Act (5 ILCS 345/0.01, et seq.) ("PEDA") through the pay period ending on May 17, 2019. During this time, plaintiff reported frequently to Sergeant Kirkwood—who had been appointed his supervisor during his leave—about his condition, and his condition improved from rest at home.

Plaintiff says that, by Spring 2019, his condition had improved sufficiently such that he contacted defendant's Chief of Police, Eddie Winters, about opportunities to return to active duty with appropriate limitations for his condition. After plaintiff was not selected for a newly

2

created position that he sought in the Spring of 2019, he maintained his contact with Chief Winters and Sergeant Kirkwood, who encouraged his efforts to return to active duty.

In April 2019, Christopher Clark was elected Mayor of the City. At some point around this time, Mayor Clark instructed Erica Kimble, the City's HR Director, to terminate several employees, including plaintiff. And in May 2019, the new administration, with Mayor Clark's approval, performed a "ghost payroller audit"—under which the City departments were to instruct employees to pick up in person their next payroll check from the HR Department at City Hall. The ghost payroller audit was an attempt to identify workers who were being paid without working, and to help the City, which was then transitioning to a new online pay system, make sure that the correct status of each employee was obtained before transferring their records to the new system.

An HR Department employee, Suzanne Swanigan, handed the checks out and checked off the names of employees who received their checks. Swanigan provided the City's HR Director, Erica Kimble, with the uncollected checks and a corresponding list of people with uncollected checks, which included plaintiff.

Meanwhile, in that same month of May 2019, plaintiff filled out a W-4 form for the City that was retained in the City's records. And at some point in that same month, plaintiff received a phone call from a fellow police officer informing plaintiff (without explanation) that he had to pick up his paycheck at City Hall rather than from Police Headquarters. When plaintiff went to City Hall to do so, Kimble told him that she did not have his check because it had been given to Chief Winters and returned to Police Headquarters. Plaintiff did not go to pick up his paycheck, and decided instead to wait until the next pay period to attempt to do so. He never received that

paycheck or any other paychecks from the City after the check for the pay period ending May 17, 2019.   Plaintiff believed that the issues with his pay would be worked out when his ongoing contacts with Chief Winters allowed him to return to active duty.

From the ghost payroll audit, Kimble determined that several employees on the list were no longer working for the City and should be terminated from the payroll system—including plaintiff, who was being paid yet did not appear to have any remaining accrued benefit days left. Kimble provided the uncollected-checks list to Mayor Clark and City Manager, Timothy Williams.   At a meeting about ghost payrollers where Mayor Clark, Williams, and Kimble were present, Clark approved the termination of plaintiff, and Kimble managed the termination of 8 to 10 other City employees on the list.   The City has admitted that plaintiff was terminated because he was identified as one of the people being paid without working.   His termination was effective June 2, 2019.   The City Council was not involved in the decision to terminate Plaintiff or anyone else.   Indeed, the City Council is not involved in the termination of individual employees; it is involved with individual employees only to the extent that the City Council votes on contract employees or the contract of vendors.

Plaintiff did not receive any notice that he was terminated or that if he did not return to work, his job was at risk if he failed to pick up a payroll check on time.   Nor did defendant have any pre-disciplinary meeting or hearing to discuss plaintiff's termination.   Plaintiff was a member of the "Sworn Sergeants" covered under a collective bargaining agreement ("CBA") between the City and the Metropolitan Alliance of Police.   The termination process, listed in the CBA, involves a pre-disciplinary meeting with the police department where the employee is presented with a list of charges, the employee will speak to those charges, and a decision will be

4

made, if not through a civil service commission, then through arbitration, and finally, administrative review under the Illinois Administrative Review Law. During this time, the City used the same procedures—including termination procedures—for civil servants and non-civil servants, and did not maintain a civil service board, police board, or civil service commission that conducted hearings in connection with the termination of civil service employees.

At some point after plaintiff injured his knee, he filed a workers' compensation claim, which defendant disputed and ultimately denied. On July 2, 2019, plaintiff settled that workers' compensation dispute with the City for $16,998.76. About a week later, plaintiff saw his doctor and received a partial release to return to duty. A few days later, he reported to HPD that he was able to return to work on restricted duty. Sergeant Tibbs, who worked in internal affairs at HPD, told plaintiff that because of the settled workers' compensation dispute between plaintiff and the City, no restrictive duty could be assigned, and that plaintiff could not return to work until he was clear to work at full capacity.

In October 2019, plaintiff met with Chief Winters, and the two agreed that plaintiff would return to duty on October 14, 2019. The next day, plaintiff reported to duty with a note from his doctor, which said that he was released to return to duty with no restrictions. But Sergeant Tibbs told him that could not start work because he had to pass a "Fitness for Duty" exam. The City requires that exam before a police officer can return to duty after taking time off for an injury. Sergeant Tibbs told plaintiff that he would call him to schedule the exam. Defendant says that plaintiff was aware that he needed to take the exam, but did not contact anyone at the City about it until December 2019. Regardless, HPD did not contact him from October to December 2019 to schedule the exam.

5

On December 12, 2019, plaintiff emailed Chief Winters to ask when he could return to work, and a few days later, Chief Winters provided plaintiff with a Fitness for Duty form. Chief Winters forwarded plaintiff's email to Kimble, stating that he was "of the understanding that a fitness for duty was the only thing holding [plaintiff] up." Kimble sent an email to plaintiff informing him that the HR Department had not received any documents related to plaintiff's doctor's visits, treatments, or release from any healthcare provider. And plaintiff had not previously given any of the documents he received from his doctor to anyone in the HR Department, and ultimately did not do so in response to Kimble's e-mail.

Plaintiff then met with Kimble in an unscheduled meeting at City Hall, where they discussed plaintiff's need for a fit for duty exam. Kimble issued approval for him to receive the exam. In January 2020, plaintiff visited a hospital and received a certification for Fitness for Duty. He was released to return to work without restriction.

In February 2020, plaintiff met with City Manager Williams and HR Director Kimble to inquire about his reinstatement. There, Kimble stated: "we fired you a long time ago," finally informing him that he had been terminated eight months before.

Plaintiff filed a grievance around March 2020 alleging illegal termination, but did not pursue it further after he was informed that he no longer had Union representation for it.

In September 2021, plaintiff filed this lawsuit, alleging that defendant violated his rights when it terminated him.

## **DISCUSSION**

Both parties have moved for summary judgment. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the case under the governing law and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for resolution at trial. See id. at 249. The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. It must instead "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict for the nonmovant. Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir.1988). If the record as a whole could not lead a reasonable factfinder to find for the nonmovant, there is no genuine issue for trial and summary judgment is appropriate. See Matsushita Elec., 475 U.S. at 587.

That the parties here have cross-moved does not disturb this framework. Indeed, "[t]he ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [the court] construe[s] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." Blow v. Bijora, Inc., 855 F.3d 793, 797 (7th Cir. 2017). "Cross-motions must be evaluated together, and the court may not grant

summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." Bloodworth v. Vill. of Greendale, 475 F. App'x 92, 95 (7th Cir. 2012). Even when the parties agree that there is no genuine dispute over material facts, the court can still deny both motions if the parties fail to establish their right to judgment as a matter of law. Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc., 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022). With these principles in mind, the court turns to the plaintiff's causes of action.

### Counts I and II - Liability

In Count I, plaintiff alleges that defendant is liable under 42 U.S.C. § 1983. Section 1983 provides a cause of action against a person who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws of the United States." Livadas v. Bradshaw, 512 U.S. 107, 132 (1994) (cleaned up). It provides the procedural vehicle "for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted). But the Supreme Court long ago held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). So plaintiff has also pleaded what is commonly called a "Monell" claim in Count II. In their briefs, the parties agree that both counts should be "consolidated" and considered as one here. The court agrees and will consider the two counts together.

To establish a section 1983 claim, a plaintiff must prove two things: (1) that "the conduct complained of was committed by a person acting under color of state law"; and (2) that "this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or

laws of the United States." Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1, 143 F.3d 351, 355 (7th Cir. 1998) (citation omitted). Under Monell, "a government as an entity is responsible under § 1983" when "the execution of a government's policy or custom"— "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy"—is what "inflicts the injury" on the plaintiff. 436 U.S. at 694. To establish his section 1983 claim against the City here, then, plaintiff must prove: (1) that he has suffered the deprivation of a constitutional right; and (2) that defendant's official custom or policy caused that deprivation. Powe v. City of Chi., 664 F.2d 639, 643 (7th Cir. 1981) (citing Monell, 436 U.S. at 690-91).

Deprivation of a Constitutional Right

Turning to the first element, plaintiff here asserts that defendant is liable under section 1983 because it acted under the color of state law and deprived him of his rights to notice and due process under the Fourteenth Amendment when it terminated his civil service employment. Defendant does not dispute that plaintiff was terminated under color of law. But it does dispute that his rights to notice and due process were violated under the Fourteenth Amendment.

"The Due Process Clause of the Fourteenth Amendment forbids a state from depriving any person of 'life, liberty, or property, without due process of law.'" Khan v. Bland, 630 F.3d 519, 527 (7th Cir. 2010) (quoting U.S. Const. amend. XIV, § 1). "An essential component of a procedural due process claim is a protected property or liberty interest." Id. (citation omitted). Plaintiff argues here that he was deprived of a protected property interest. To show a procedural due process violation based on a protected property interest, plaintiff must establish that there is

"(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." Id.

### Cognizable property interest

Plaintiff contends that he was a Civil Service Sergeant with a cognizable "property interest in employment." "For public employees like [plaintiff], a protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract." Bradley v. Vill. of Univ. Park, Ill. ("Bradley II"), 59 F.4th 887, 902 (7th Cir. 2023) (cleaned up). Where state law gives people a benefit and creates rules for revoking that benefit, "the recipients have a secure and durable property right, a legitimate claim of entitlement." Cornelius v. LaCroix, 838 F.2d 207, 210 (7th Cir. 1988). To establish "a legitimate expectation of continued employment," then, "a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him. Cheli v. Taylorville Cmty. Sch. Dist., 986 F.3d 1035, 1039 (7th Cir. 2021) (citation omitted).

Plaintiff contends that he "retained a property interest in his continued civil service employment under the laws of the State of Illinois, the City of Harvey Municipal Code, and the applicable collective bargaining agreement." He cites, for example, two Illinois statutes—65 ILCS 5/10-1-18 and 5/10-2.1-17—and argues that "a police officer or civil service officer shall not be removed or discharged 'except for cause, upon written charges, and after an opportunity to be heard in his own defense.'" (Quoting 65 ILCS 5/10-2.1-17). And he asserts that case law supports that he has protectable property interest in his employment and that the City itself has recognized this in its Municipal Code and in the CBA. Section 7.6 of the CBA, for example,

states that "dismissal of a non-probationary Officer shall occur only for reasonable 'just cause.'" For its part, defendant does not dispute that plaintiff has a protectable property interest in his continued employment.

Because there is no dispute that the Illinois statutes, Municipal Code, and CBA limit the ability of defendant to discharge plaintiff, the court finds that plaintiff had property interest in his continued employment.   See Selmani v. Vill. of Bartlett, 515 F. Supp. 3d 882, 887 (N.D. Ill. 2021) (finding that police officer adequately alleged a property interest related to employment stemming from 65 ILCS 5/10-2.1-17); see also Cheli, 986 F.3d at 1040 ("just cause" or "for cause" is "language that courts regularly hold . . . create[s] an expectation of continued employment for due process purposes"); Carmody v. Bd. of Trustees of Univ. of Ill., 747 F.3d 470, 474 (7th Cir. 2014) ("A public employee who can be fired only for good cause has a property interest in his or her job and may be deprived of that property interest only with due process of law."); Misek v. City of Chi., 783 F.2d 98, 100 (7th Cir. 1986) (65 ILCS 5/10-1-18's "for cause" provision provided civil service employees "a Fourteenth Amendment property interest in their continuing employment" and thus the employees "could be dismissed only in accordance with federal due process standards").

<u>Deprivation of property interest</u>

There is also no genuine dispute here that plaintiff was deprived of the property interest in his continued employment.   Indeed, defendant readily admits that Mayor "Clark . . . decided to terminate Plaintiff's employment with the City."

Defendant briefly argues—at the end of a section of its brief titled "the effect of random and unauthorized acts," which discusses a separate argument (further discussed below) that

11

plaintiff's termination was a "random and unauthorized" act that could not create liability—that plaintiff was not deprived of his protectable property interest in his employment because he was on (unpaid) leave at the time he was terminated.   In support, he cites Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985), and argues that plaintiff "lost" no salary and benefits "by missing a pretermination hearing."   But Loudermill undermines defendant's argument.   As the Supreme Court there emphatically stated: "the significance of the private interest in retaining employment cannot be gainsaid."   Loudermill, 470 U.S. at 543.   One reason why, the Court explained, was that although "a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job."   Id.   So although "[a]rguably, the pre-termination employment interest of someone like" plaintiff may not be "as weighty as that of an individual, like those in Loudermill, who were actively working and earning wages at the time of their discharges," Chaney v. Suburban Bus Div. of Reg'l Transp. Auth., 52 F.3d 623, 629 n.2 (7th Cir. 1995), plaintiff still had a "substantial interest in continued employment," id. at 629.

The court finds that undisputed facts establish that plaintiff was deprived of his continued employment.

Denial of Due Process

The dispute here turns on whether plaintiff was denied due process when he was terminated.   When a public employee has a property interest in his job, he is entitled to predeprivation procedures.   Bradley v. Vill. of Univ. Park, Ill. ("Bradley I"), 929 F.3d 875, 882 (2019).   The "purpose" of a pre-termination procedures "is to provide 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to

12

believe that the charges against the employee are true and support the proposed action.'" Carmody, 747 F.3d at 475 (quoting Loudermill, 470 U.S. at 545-46). Requiring such procedures reflects the "common sense" notion that it is "harder to convince an employer to reverse a decision to fire someone than to make sure the initial decision is fair and thoughtful." Id. Simply stated, "once an individual or group has made a decision to take a particular course of action, it becomes harder and harder to change course, even in the face of powerful conflicting evidence and reasons." Id.

Although "[b]eing fired from a job does not require a predeprivation hearing that approximates a full trial," "a job is nonetheless a substantial enough property interest that, absent extenuating circumstances such as an emergency, the basics of predeprivation due process must be provided." Bradley I, 929 F.4th at 882 (citation omitted). "Thus, in the normal course of terminating a public employee who has a property interest in his or her job, 'the root requirement of the Due Process Clause' is the provision of adequate notice and 'some kind of a hearing' to a public employee '*before* he is deprived of any significant property interest.'" Id. (quoting Loudermill, 470 U.S. at 542 (emphasis in original)). "The nature and extent of the process a public employee is due before termination depend on the adequacy of any post-termination hearing that was available." Carmody, 747 F.3d at 474. But "[e]ven where there is a robust post-termination procedure, . . . a meaningful opportunity to be heard before the employer decides on termination is a critical protection." Id. at 475. At a minimum, then, a public employee is entitled to: "(1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his or her side of the story."

Id.; see also Bradley I, 929 F.4th at 882 (predeprivation procedures require "notice of the proposed deprivation, a statement of reasons, and an opportunity to be heard in response").

It is undisputed here that plaintiff received no notice, no statement of reasons, and no opportunity to be heard before he was terminated effective June 2, 2019. Indeed, the undisputed facts are that in May 2019, Mayor Clark's administration performed a "ghost payroller audit" to identify workers who were being paid without working, and to check the status of each employee before transferring their records to a new system. From the audit, HR Director Kimble determined that several employees on the list—including plaintiff—were no longer working for the City and should be terminated from the payroll system. Kimble provided the names of those employees to Mayor Clark and City Manager Williams. And at a meeting where Mayor Clark, Williams, and Kimble were present, Mayor Clark approved the termination of plaintiff. Plaintiff received neither any notice of a termination, any notice that his job was at risk if he failed to pick up a payroll check on time, or any pre-discharge meeting or hearing to discuss his termination.

This would appear to be a due process violation. See Schultz v. Baumgart, 738 F.2d 231, 236 (7th Cir. 1984) ("if [defendant] summarily fired [plaintiff], affording him neither prior notice nor an opportunity to respond, due process would have been violated").

Yet defendant maintains that plaintiff was nevertheless not deprived of due process. That is because, it says: the termination was a "random and unauthorized" act; there was "no practical opportunity to provide Plaintiff a predetermination hearing"; and the post-termination remedies offered through the CBA were sufficient to satisfy due process. Stated otherwise,

14

defendant argues that what is known as the "Parratt" exception to § 1983 liability for a lack of due process applies here.

In doing so, defendant is essentially making the same argument that the Village of University Park made in Bradley I to avoid liability for having fired a police chief (Bradley) without any notice or any form of hearing.   In that case, University Park and its mayor conceded that "Bradley had a protected property interest in his continued employment," that "the mayor and the village board are the policymakers for their municipality," and that Bradley had "received no pretermination notice or hearing."   Bradley I, 929 F.3d at 878.   The Seventh Circuit explained that this "suffice[d] to prove a due process claim under § 1983 against the individual officials and the village itself, where the village acted through high-ranking officials with policymaking authority."   Id.   But the defendants nonetheless sought "to avoid th[at] straightforward conclusion" and "urge[d] [the Seventh Circuit] to follow a line of cases"—in particular, Parratt v. Taylor, 451 U.S. 527 (1981) and its progeny—"that excuses liability for the absence of predeprivation due process if the deprivation is the result of a random, unauthorized act by a state employee, rather than an established state procedure, and if a meaningful postdeprivation remedy for the loss is available."   Id. at 879 (cleaned up).

The Seventh Circuit rejected that argument for "several reasons."   Id.   "First," the court explained, "the Supreme Court has never suggested that the pragmatic but narrow rule of *Parratt* applies to employee due process claims where predeprivation notice and an opportunity to be heard could be provided in a practical way."   Id.   "In addition," the court continued, "the decision to fire Bradley was made by the top municipal officials," and the Seventh Circuit has long held "that 'a complaint asserting municipal liability under *Monell* by definition states a

15

claim to which *Parratt* is inapposite.'" <u>Id.</u> (citation omitted). According to the court, "[i]n cases alleging due process violations by municipal policymakers, there is no need to inquire separately into whether an employee's actions were 'random and unauthorized.'" <u>Id.</u> The court in <u>Bradley I</u> thus rejected the defendants' theory "that their official action—taken by the village's highest-ranking officials with final policymaking authority—should be considered 'random and unauthorized' and thus excused under *Parratt*." <u>Id.</u> at 885.

The court finds that <u>Bradley I</u> forecloses defendant's reliance on <u>Parratt</u>'s "rare exception to due process norms." <u>Id.</u> at 886. For starters, predeprivation notice and an opportunity to be heard could have been provided here in a practical way. <u>Id.</u> at 879. Again, <u>Bradley I</u> explained that "the Supreme Court has never suggested that the pragmatic but narrow rule of *Parratt* applies to employee due process claims where predeprivation notice and an opportunity to be heard could be provided in a practical way." <u>Id.</u> For good reason: The <u>Parratt</u> "exception is based on the pragmatic reasoning of *Parratt*"—"that in some cases providing a hearing before deprivation is a practical impossibility." <u>Luster v. Vill. of Ashmore</u>, 76 F.4th 535, 537 (7th Cir. 2023) (cleaned up)). This is not one of those cases.

Defendant argues that "[t]here was no practical opportunity to provide Plaintiff a predetermination hearing" because "[i]n all respects it appeared that he had abandoned his job." But putting aside the fact that this wouldn't excuse failing to at least give him notice at the time he was terminated, there is no genuine dispute that before the effective date of his termination: plaintiff reported frequently to his supervisor, Sergeant Kirkwood; plaintiff had contact with Chief Winters; plaintiff filled out a W-4 form for the City that was retained in the City's records; and plaintiff met with HR Director Kimble after the City began the ghost payroll audit. No

reasonable jury could conclude here that it was a "practical impossibility" to give notice and a hearing to plaintiff before he was terminated.

What's more, as the court will now explain, the Mayor was a policymaker under Monell. As a result, "*Parratt* is inapposite" for this additional reason. Bradley I, 929 F.3d at 879 (cleaned up).

<u>Official Custom or Policy Caused the Deprivation</u>

As explained above, under Monell, a municipal entity may be held responsible under § 1983 when the execution of its "policy or custom" is what "inflicts the injury" on the plaintiff. 436 U.S. at 694. Or otherwise stated, "[l]ocal governments are liable for damages under § 1983 only for violations of federal rights that occur 'pursuant to official municipal policy of some nature.'" Bradley, 929 F.4th at 884 (quoting Monell, 436 U.S. at 691). This "official policy" requirement is "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality and to limit liability to action for which the municipality is actually responsible." Id. (cleaned up) (emphasis in original). That is because "municipalities are not liable for the torts of their employees under the strict-liability doctrine of respondeat superior, as private employers are." Vodak v. City of Chi., 639 F.3d 738, 747 (7th Cir. 2011).

"The critical question under *Monell*," then, "is whether a municipal . . . policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 379 (7th Cir. 2017) (en banc). To show that a municipal policy gave rise to the harm, a plaintiff "must show that the tort was committed (that is, authorized or directed) at the policymaking level of government—by the city council, for example, rather than by the police officer who made an illegal arrest." Vodak, 639

F.3d at 747; see also Glisson, 849 F.3d at 381 (reframing the "critical question under *Monell*" as: "is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?"). To establish that the tort was committed at the policymaking level, a plaintiff can show that the unconstitutional act was caused, (1) by an official policy, (2) by a governmental custom that is widespread and well-settled, or (3) by a decision from an official "whose edicts or acts may fairly be said to represent official policy." Bradley I, 929 F.3d at 884 (citation omitted); see also Glisson, 849 F.3d at 379.

Here, plaintiff relies on the last circumstance. He argues that his termination "was the direct result of a policy determination made directly by the Mayor, an official with policy-making authority, to conduct a ghost payroll audit and to terminate [plaintiff] without written notice or the opportunity to be heard." (Emphasis removed). In response, defendant argues that Mayor "Clark was not the final policymaker with respect to the employment decision to terminate Plaintiff, even if he was the one who made the decision on Plaintiff's termination." Mayor Clark, they continue, "only had 'a say' in the termination of Plaintiff"; he "was not delegated with the legal authority to terminate police officers, let alone the final say in making unilateral terminations of police officers." (Emphasis removed).

Plaintiff counters in reply that Mayor Clark had at least de facto final policymaking authority over employment decisions, including his "ghost payrollers" policy to eliminate employees, which led directly to plaintiff's and others' terminations. He cites Valentino v. Vill. of S. Chi. Heights, 575 F.3d 664 (7th Cir. 2009), for the proposition that a mayor can be a de factor policymaker on personnel decisions, and Kristofek v. Vill. of Orland Hills, 712 F.3d 979 (7th Cir. 2013), for the notion that even a police chief can be. He further points out that it is

18

undisputed that the City never had a Civil Service Commission at the relevant time—which nullified any supervision they had over employment decisions—and that the City Council is not involved in terminating individual employees. He also cites Harvey Municipal Code provisions—Harvey Mun. Code §§ 2-04-020(A), 2-32-030, and 2-32-200—which contemplate that the Mayor will direct employment decisions for both non-civil service and civil service employees alike. Plaintiff thus concludes that Mayor Clark "was the apex of employment policymaking for civil service sergeants."

Defendant argues in its reply that plaintiff "is equating decision making with policy making." And the policymaker here, defendant says, "was the City Council, as they are the only entity that could, and did, approve the City's entering into the CBA with the Union, which in turn provided" protections "for terminated Sergeants." Defendant further argues that "Plaintiff has not shown that there were any other instances of disciplinary action taken by a decisionmaker that subsequently went consciously unreviewed multiple times" and "there are zero allegations that [Mayor] Clark conducted ghost-payroll audits multiple times or even pushed for and facilitated the termination of other City employees, let alone Sworn Sergeants." (Emphasis removed). "Indeed," defendant argues, "Plaintiff points to no other instances, aside from this one single ghost-payroll audit where such 'policy' was prescribed or acquiesced by the full City Council."

The court finds that Mayor Clark was an official with final policy making authority. This is an issue of law for the court. See Valentino, 575 F.3d at 675 ("The determination of whether a person has policymaking authority is a question of state law, and is to be decided by the court."); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) ("the

19

identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury" (emphasis in original)).   To "have final policymaking authority, an official must possess responsibility for making law or setting policy."   Killinger v. Johnson, 389 F.3d 765, 772 (7th Cir. 2004) (cleaned up).   The "inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue."   Valentino, 575 F.3d at 675 (cleaned up).

The relevant inquiry here, then, is whether Mayor Clark is a policy-maker on personnel decisions.   In performing this inquiry, it can be "[h]elpful" to look to: "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."   Valentino, 575 F.3d at 676 (cleaned up) (concluding that a plaintiff could proceed on a Monell claim because she provided evidence that the mayor's personnel decisions were not reviewed). It can also be helpful to review "ordinances, rules and regulations" and "relevant customs and practices having the force of law."   Id.   Ultimately, "it doesn't matter what *form* the action of the responsible authority that injures the plaintiff takes.   It might be an ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff).   The question is whether the . . . the decisionmaker . . . was at the apex of authority for the action in question."   Gernetzke v. Kenosha Unified School District No. 1, 274 F.3d 464, 468 (7th Cir. 2001) (emphasis in original).

The court finds that Mayor Clark was at the "apex of authority" for the termination here.

To begin with, defendant does not meaningfully contest that Mayor Clark was at least a decisionmaker on the City's personnel decisions—including those related to civil service sergeants.   Nor could it: plaintiff cites city ordinances showing as much.   See Harvey Mun. Code § 2-04-020(A) ("The mayor shall supervise the conduct of all the officers of the city, and as to all who are exempt from the provisions of the Civil Service Act, he shall examine the grounds of all reasonable complaints made against any of them and cause their violation of duty and other offenses, if any, to be promptly punished."); id. § 2-32-030 ("Subject to the rules of the [police] department and the direction of the mayor, the chief of police shall have the power and duty . . . [t]o discharge . . . employees of the [police] department, in accordance with the civil service commission rules and regulations and applicable collective bargaining agreements." (emphasis added)).   Mayor Clark was therefore a decisionmaker on employment issues.   See Valentino, 575 F.3d at 676 ("several Village ordinances indicate that Mayor Owen makes personnel decisions regarding Village employees").

But defendant correctly notes that a decisionmaker is not equivalent to a policymaker. Indeed, "just because [Clark] makes personnel decisions does not necessarily mean that he is the final decisionmaker on such matters such that he can be considered a policymaker for the [City] in this area." Id. (emphasis removed).   Rather, "[t]here must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." Id.

The court agrees with plaintiff, though, that there was such a delegation of authority here. To start, it is undisputed that the City Council is not involved in the termination of individual employees—and thus does not review the Mayor's personnel decisions.   And although defendant argues that City Council approved the City's entering into the CBA—which, it says, in

turn provided protections for terminated sergeants—it is undisputed that at least during the relevant period here, the City did not maintain a civil service board, police board, or civil service commission that conducted hearings on the termination of civil service employees.   There was accordingly no check whatever on the Mayor's employment decisions at the relevant time.

Defendant also appears to concede that the City Council at least de facto delegated or ratified Mayor Clark's ghost-payroll termination policy here.   See Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind., 183 F.3d 734, 737 (7th Cir.1999) ("Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority.").   To be sure, defendant paints this as a one-time event, faulting plaintiff for pointing "to no other instances, aside from this one single ghost-payroll audit where such 'policy' was prescribed or acquiesced by the full City Council."   (Emphasis added).   But City Counsel "prescrib[ing] or acquiesc[ing]" in the Mayor's policy action here is enough: "It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once."   Kristofek, 712 F.3d at 987 (finding that plaintiff stated a plausible claim that a police chief "had at least de facto authority to set policy for hiring and firing").

The court thus concludes that Mayor Clark was at the apex of authority here.   Indeed, the "acts of the Mayor" here were not "merely acts of an errant employee" for which plaintiff is attempting to hold the City liable.   Vodak, 639 F.3d at 747; see also Bradley I, 929 F.3d at 886 ("In the past we have disparaged similar attempts to evade municipal liability, dismissing as 'extravagant' a claim that the 'acts of [a] Mayor ... are merely acts of an errant employee.'" (quoting Vodak, 639 F.3d at 747)).   This was not some low-level city employee committing a

22

tort.  See Vodak, 639 F.3d at 747 (explaining that under Monell, tort must have been "committed (that is, authorized or directed) at the policymaking level of government—by the city council, for example, rather than by the police officer who made an illegal arrest").   On the contrary, Mayor Clark "*was* the City, so far as the [termination actions] were concerned."   Id. at 748 (emphasis in original).

In short, plaintiff has established that Mayor Clark was a final policymaker for the City, allowing it to be subject to § 1983 liability under Monell.   Because pre-deprivation notice and an opportunity to be heard could have been provided here in a practical way and because Mayor Clark was a policymaker under Monell, defendant's Parratt argument fails.   Bradley I, 929 F.3d at 879.

The court notes, too, that even if defendant's argument about the CBA's post-termination remedies being sufficient were not foreclosed by Bradley I, that argument would fail.   For one thing, defendant's own cited case, Chaney v. Suburban Bus Div. of Reg'l Transp. Auth., held that "due process requires pre-termination notice and an opportunity to respond even where a CBA provides for post-termination procedures that fully compensate wrongfully terminated employees."   52 F.3d at 629; see id. ("In light of the CBA's post-termination grievance and arbitration procedures, the added benefits in this case of pre-termination notice and an opportunity to be heard are not huge, but they are in no way insignificant.").

For another thing, even if plaintiff had "waived" a post-termination grievance procedure, as defendant contends, that would not relieve defendant's obligation to provide pre-termination procedures.   It would merely "foreclose[ ] his due process claim to the extent it is premised on that [post-deprivation] hearing."   Grant v. Trustees of Indiana Univ., 870 F.3d 562, 571 (7th Cir.

23

2017) (emphasis added) ("decision to bow out of the post-termination hearing—a decision he made freely—forecloses his due process claim to the extent it is premised on that hearing" (citation omitted)).   But he would still be entitled to at least a "truncated" pre-termination procedure, which again requires at least: "(1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his or her side of the story."   Shreffler v. City of Kankakee, Ill., No. 21-3376, 2024 WL 1826976, at *4 (7th Cir. Apr. 26, 2024), at *4; see also Grant, 870 F.3d at 571 (recognizing that decision to "bow out" of post-termination process still required "analyz[ing] the sufficiency of . . . pre-termination process").   Here, again, it is undisputed that plaintiff received neither notice nor an opportunity to respond before being terminated.   Defendant's reliance on post-termination procedures therefore fails.

The court finds that there are no genuine disputes over any material facts related to liability on the § 1983 Monell claim, and that plaintiff is entitled to judgment as a matter of law on that claim.   The court thus grants summary judgment to plaintiff on Counts I and II as to liability.

### Counts III and IV

In Counts III and IV, plaintiff asserts violations of the ADEA and ADA, respectively. Defendant has moved for summary judgment on these claims.   It argues that they fail because plaintiff was fired for a non-discriminatory reason and Mayor Clark was not aware of plaintiff's injury or protected class status.   The court grants defendant's motion for summary judgment on Counts III and IV.

24

First, plaintiff failed to respond to (or even mention) defendant's cross-motion on these counts in his briefing.   He has thus waived any argument in support of them.   Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017).

Second, there are no genuine disputes over any facts that are material here and defendant is entitled to judgment as a matter of law on these counts.   To establish his ADEA and ADA claims, plaintiff must show that he was terminated because of his age and perceived disability. See Hillmann v. City of Chi., 834 F.3d 787, 795 (7th Cir. 2016) (ADA claims); Horwitz v. Bd. of Educ., 260 F.3d 602, 610 (7th Cir. 2001) (ADEA claims).   He cannot do so.

It is undisputed here that, based on the ghost payroll audit, HR Director Kimble determined that plaintiff was no longer working for the City and should be terminated.   It is also undisputed that Kimble then had a meeting with Mayor Clark about the ghost payrollers where Mayor Clark approved terminating plaintiff.   Defendant argues that plaintiff was therefore terminated for a non-discriminatory reason—being an actual or suspected ghost-payroller.   The court notes that there does appear to be at least some evidence that may suggest other motives. For example, it is undisputed that even before the ghost payroll audit, Mayor Clark instructed Kimble to terminate several employees, including plaintiff.   According to Kimble's affidavit, this instruction "did not seem to relate to job performance" but instead "personal reasons that went back many years."   But this evidence does not suggest anything related to age or disability. And plaintiff has not argued otherwise.

The fact is, plaintiff has not come forward with any evidence from which a reasonable jury could find that the ghost payroller reason was a pretext to fire him for his age or a disability. This dooms his claims in Counts III and IV.   See Othon v. LG Elecs. USA, Inc., No. 08 C 878,

2009 WL 1748243, at *4 (N.D. Ill. Jun. 18, 2009) (granting summary judgment for LG on ADA claim where "undisputed evidence" indicated that LG had a non-discriminatory reason for terminating the plaintiff and plaintiff failed to "put forth sufficient evidence that would indicate pretext" for discrimination); see also Orlando v. Wal-Mart, No. 1:07-CV-0294, 2009 WL 3163118, at *5 (S.D. Ind. Sept. 25, 2009) (granting summary judgment for Wal-Mart on ADA claim where Wal–Mart "articulated a legitimate, nondiscriminatory reason" to terminate the plaintiff and she failed to reply or offer evidence showing that Wal–Mart's stated reason was a pretext for discrimination).

Defendant is thus entitled to judgment as a matter of law on those claims. The court accordingly grants summary judgment for defendant on Counts III and IV.

## CONCLUSION

For the reasons above, plaintiff's motion for summary judgment [139] is granted as to liability on Count I and Count II. Defendant's cross-motion for summary judgment [155] on those counts is denied but is granted as to Count III and Count IV. Plaintiff's motion to supplement its motion for partial summary judgment and its request for judicial notice [140] appear to be unopposed. The court thus grants that motion [140]. The parties are directed to submit a joint status report by April 11, 2025, suggesting a procedure for determining damages and other relief on Counts I and II.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:     March 20, 2025**

26