IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TERENCE HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 04777 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| CITY OF HARVEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Terence Hawkins worked as a police officer for the City of Harvey ("defendant" or the "City"). He filed this lawsuit against defendant, alleging that it denied him the opportunity to return to work after he injured his knee, and then surreptitiously terminated him based on his age and injury. He asserted four counts in the operative second amended complaint: a claim under 42 U.S.C. § 1983 for violating his Due Process Rights under the Fourteenth Amendment (Count I); a Monell claim (Count II); a claim under 29 U.S.C § 621, et seq., for violating the Age Discrimination in Employment Act ("ADEA") (Count III); and a claim under 42 U.S.C. § 12101, et seq., for violating the Americans with Disabilities Act (Count IV). On March 20, 2025, the court granted plaintiff's motion for summary judgment as to liability on Counts I and II, denied defendant's cross-motion for summary judgment on those counts, and granted defendant's motion for summary judgment on Counts III and IV. See Hawkins v. City of Harvey, No. 21 C 04777, 2025 WL 875210 (N.D. Ill. Mar. 20, 2025).

As for Counts I and II, the court found that plaintiff was deprived of a constitutional right to pre-termination due process because he indisputably received no notice, no statement of reasons, and no opportunity to be heard before he was terminated, and that defendant's official

custom or policy caused that deprivation. The court thus directed the parties to suggest a procedure for determining damages and other relief on Counts I and II.

A few months later, defendant filed two motions: a "motion for relief to amend and clarify" the court's summary judgment order; and a motion to "compel arbitration between the parties on whether there was just cause for Plaintiff's termination and the damages Plaintiff is entitled to for due process violations." The court denied both motions [Dkts. 193 & 194].

The parties thereafter jointly requested time to try to settle the case, which the court permitted, but they were ultimately unable to do so. So they proceeded to a bench trial on whether defendant had "cause" to terminate plaintiff and to determine any appropriate remedies for the constitutional deprivation. The parties have now provided post-trial briefs. For the following reasons, the court awards plaintiff damages and reinstatement.

## DISCUSSION

### Legal Standard following a Bench Trial on Remedies

"When a federal judge is the trier of fact, he, unlike a jury, is required to explain the grounds of his decision." Arpin v. United States, 521 F.3d 769, 776 (7th Cir. 2008) (citing Fed. R. Civ. P. 52(a)). "This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion." Id. (citation omitted).

Yet, in reaching a decision under Rule 52, the court need not "discuss each piece of evidence in the record," "make findings on all facts presented," "conform [its] opinion[ ] to any particular template[,] or . . . produce decisions of any particular length." Oye v. Hartford Life & Accident Ins. Co., 140 F.4th 833, 838 (7th Cir. 2025) (citations omitted). Nor need it always set

out findings of fact and conclusions of law in separate labeled sections. See Alabama State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama, 612 F. Supp. 3d 1232, 1248 (M.D. Ala. 2020). In the end, what matters is that the court include "sufficient subsidiary facts so that [an appellate court] can clearly understand the steps by which [the court] reached its ultimate conclusion," and that the court's "ultimate decision is plausible in light of the record viewed in its entirety." Oye, 140 F.4th at 838 (cleaned up).

This opinion contains both findings of fact and conclusions of law. To the extent that any findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law, and to the extent that any conclusions of law may be deemed findings of fact, they shall also be considered findings of fact. See McFadden v. Bd. of Educ. for Illinois Sch. Dist. U-46, 984 F. Supp. 2d 882, 886 n.1 (N.D. Ill. 2013).

## Background

### Background Facts

In 2008, defendant hired plaintiff as a patrolman for the Harvey Police Department ("HPD"). Hawkins, 2025 WL 875210, at *1.[1] In May 2013, plaintiff was promoted to Civil Service Sergeant. Id.

---

[1] The facts that were affirmatively stated in the court's summary judgment ruling were based on what the parties affirmatively stated (or stated was "undisputed") in their L.R. 56.1 filings. Those statements are now binding judicial admissions. See Banks v. Chamberlain, No. 3:18-CV-50282, 2021 WL 2529568, at *6 (N.D. Ill. June 21, 2021) ("Rule 56.1 statements of fact, responses, and even the failure to respond are judicial admissions that are binding on a party."); Horton v. City of Chi., No. 13-CV-6865, 2018 WL 6505398, at *6 (N.D. Ill. Dec. 11, 2018) (L.R. 56.1 fact is a "binding" "judicial admission" and "has the effect of withdrawing from contention the fact").

In March 2018, plaintiff injured his left knee while on duty exiting his patrol car. Id. Plaintiff returned to the police station and filled out an injury report form and submitted it to Sergeant Kirkwood. Id. Plaintiff was placed on leave and, because he was unable to perform his duties due to injury on the job, he received payment under the Illinois Public Employees Disability Act (5 ILCS 345/0.01, et seq.) ("PEDA") through the pay period ending on May 17, 2019. Id. During this time, plaintiff reported frequently to Sergeant Kirkwood—who had been appointed his supervisor during his leave—about his condition, and his condition improved from rest at home. Id.

Plaintiff testified at trial that, around May 2019, while he was still injured and on leave, he applied for the traffic supervisor position at HPD. After plaintiff was not selected for that position, he maintained his contact with Chief Winters and Sergeant Kirkwood, who encouraged his efforts to return to active duty. Hawkins, 2025 WL 875210, at *1.

Meanwhile, in April 2019, Christopher Clark was elected Mayor of the City. Id. at *2. In May 2019, the new administration, with Mayor Clark's approval, performed a "ghost payroller audit"—under which the City departments were to instruct employees to pick up in person their next payroll check from the HR Department at City Hall. Id. The ghost payroller audit was an attempt to identify workers who were being paid without working, and to help the City with its transition to a new online pay system. Id.

The City's representative at trial, Corean Davis, testified that the audit occurred on May 24, 2019. To that end, the HR Department handed the checks out and checked off the names of employees who received their checks. Hawkins, 2025 WL 875210, at *2. From the audit, the HR Department determined that several employees on the list, including plaintiff, were no longer

working for the City and should be terminated from the payroll system. Id. The City has admitted that plaintiff was terminated because he was identified as one of the people being paid without working. Id. His termination was effective June 2, 2019. Id.

Plaintiff did not receive any notice that he was terminated or that his job was at risk if he did not return to work and if he failed to pick up a payroll check on time. Id. Nor did defendant have any pre-disciplinary meeting or hearing to discuss plaintiff's termination. Id.

In early July 2019, plaintiff saw his doctor and received a partial release to return to duty. Id. at *3. A few days later, he reported to HPD that he was able to return to work on restricted duty. Id. Sergeant Tibbs, who worked in internal affairs at HPD, told plaintiff that plaintiff could not return to work until he was clear to work at full capacity. Id.

In October 2019, plaintiff met with Chief Winters, and the two agreed that plaintiff would return to duty on October 14, 2019. Id. The next day, plaintiff reported to duty with a note from his doctor, which said that he was released to return to duty with no restrictions. Id. But Sergeant Tibbs told him that could not start work because he had to pass a "Fitness for Duty" exam, which the City requires before an officer can return to duty after taking time off for an injury. Id. Sergeant Tibbs told plaintiff that he would call him to schedule the exam. Id.

In December 2019, plaintiff emailed Chief Winters to ask when he could return to work, and a few days later Winters provided plaintiff with a Fitness for Duty form. Id. Winters forwarded plaintiff's email to the HR Director, Erica Kimble, stating that he was "of the understanding that a fitness for duty was the only thing holding [plaintiff] up." Id. Kimble sent an email to plaintiff informing him that the HR Department had not received any documents related to plaintiff's doctor's visits, treatments, or release from any healthcare provider. Id.

And plaintiff had not previously given any of the documents he received from his doctor to anyone in the HR Department, and ultimately did not do so in response to Kimble's e-mail. Id.

Plaintiff then met with Kimble in an unscheduled meeting at City Hall, where they discussed plaintiff's need for a fit for duty exam. Id. Kimble issued approval for him to receive the exam. Id. In January 2020, plaintiff visited a hospital and received a certification for Fitness for Duty. Id. He was released to return to work without restriction. Id.

In February 2020, plaintiff met with the City Manager and Kimble to inquire about his reinstatement. Id. There, Kimble stated: "we fired you a long time ago," finally informing him that he had been terminated eight months before. Id.

The Court's March 20, 2025 Grant of Summary Judgment in Plaintiff's Favor

The "purpose" of pre-termination procedures "is to provide 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" Carmody v. Bd. of Trustees of Univ. of Ill., 747 F.3d 470, 475 (7th Cir. 2014) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46 (1985)). Requiring such procedures reflects the "common sense" notion that it is "harder to convince an employer to reverse a decision to fire someone than to make sure the initial decision is fair and thoughtful." Id. At a minimum, then, before a public employee can be terminated, he is entitled to: (1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity to tell his side of the story. Id.

In granting summary judgment in favor of plaintiff on Count I (Due Process) and Count II (Monell), the court found: that plaintiff had a cognizable property interest in his continued

employment; that he was deprived of that property interest because defendant had readily admitted that Mayor "Clark . . . decided to terminate Plaintiff's employment with the City," (quoting defendant's brief); and that he was denied due process because "[i]t [wa]s undisputed . . . that plaintiff received no notice, no statement of reasons, and no opportunity to be heard before he was terminated effective June 2, 2019." Hawkins, 2025 WL 875210, at *4-11.

**Legal Standard for a Remedies after a Procedural Due Process Violation**

Public employees who are terminated without pre-termination due process may be entitled to various types of relief, including: backpay, City of Chi. v. U.S. Dep't of Lab., 737 F.2d 1466, 1472-73 (7th Cir. 1984); mental or emotional distress damages, Patterson v. Portch, 853 F.2d 1399, 1408 (7th Cir. 1988); nominal damages, Patkus v. Sangamon–Cass Consortium, 769 F.2d 1251, 1265 (7th Cir. 1985); and reinstatement, Patterson, 853 F.2d at 1407-08.

Here, plaintiff seeks damages in the amount of $942,395.24, which includes "(1) full backpay from May 18, 2019 through the date of judgment, adjusted for applicable retroactive raises, including improperly applied leave, and reduced only by documented interim earnings; (2) reinstatement to the rank of Sergeant with full seniority and restoration of pension credits and post-termination leave; [and] (3) compensatory damages for emotional distress caused by the denial of procedural due process." Defendant opposes this, arguing that plaintiff was terminated for cause and is entitled to neither damages nor reinstatement.

The Seventh Circuit has explained that "a plaintiff who succeeds on a procedural due process claim is entitled to those damages that are caused by the denial of the process required by the Constitution." Alston v. King, 231 F.3d 383, 386 (7th Cir. 2000) (citing Carey v. Piphus, 435 U.S. 247, 263 (1978)). Damages "can include damages for a termination if there is a causal

connection between the termination and the failure to provide a hearing." Id. Conversely, "where the employer can prove that the employee would have been terminated even if a proper hearing had been given, the terminated employee cannot receive damages stemming from the termination in an action for a procedural due process violation." Id. In other words, if the defendant can "establish[ ] cause for [the plaintiff's] termination, damages from that termination could not be attributed to the failure to provide a hearing." Id.

But even then, "the employee may still obtain damages for emotional distress attributable to the deficiencies in procedure if the employee can convince the trier of fact that the distress is attributable to the denial of procedural due process itself rather than to the justified termination." Id. And he could also still obtain backpay—but only from the day that defendant terminated him until "the day on which his dismissal would have taken effect had [the City] followed the prescribed procedures." Patterson, 853 F.2d at 1408; see also Chi., 737 F.2d at 1472-73 (backpay from termination date until when the city could have effectuated a procedurally proper termination was an appropriate "make whole" remedy). But "[g]iven the simplicity of [the Loudermill pre-termination due process] requirements, the period of time between the employee's termination and the date on which he properly could have been terminated is unlikely to amount to more than a few days." Brewer v. Chauvin, 938 F.2d 860, 866 (8th Cir. 1991) (en banc) (Heaney, J., dissenting).

On that last point, defendant here notified plaintiff in February 2020 that he had been terminated eight months before that, and his termination was effective June 2, 2019. Hawkins, 2025 WL 875210, at *2-3. In its post-trial brief, defendant cites § 7.5(A)(iii) of a collective bargaining agreement or "CBA" that was apparently in effect from October 22, 2015, to April

30, 2018, to suggest that the City would have provided the pre-termination hearing "within 30 days of charges being filed."[2] Plaintiff has not disputed this assertion. But neither party provides a date by which the "charges" would have been filed or by which a hearing would have occurred. Because plaintiff was terminated June 2, 2019, the court finds that a pre-termination hearing would have taken place by July 2, 2019. Thus, if defendant can show that it would have had cause to terminate plaintiff, plaintiff's damages would be limited to any he can prove based on any distress attributable to the denial of procedural due process (as opposed to the justified termination) and to backpay he could establish through July 2, 2019.

As for reinstatement, and as explained in more detail below, if defendant can prove that it would have had cause to terminate plaintiff, then plaintiff is not entitled to reinstatement. Patterson, 853 F.2d at 1407-08. So to determine the scope of damages and whether reinstatement is possible, the court must begin by determining whether defendant has established that it would have had cause to terminate plaintiff.

## Determining "Cause" for Damages and Reinstatement

### The relevant timeframes for "cause"

As explained above, to meet its "cause" burden, defendant must show that "even if a proper hearing had been given," it still would have terminated plaintiff. Alston, 231 F.3d at 386. At a proper hearing, the City would have needed to provide an "explanation of the reasons for the decision to potentially terminate him," Vukadinovich v. Hanover Cmty. Sch. Corp., No.

---

[2] The parties reference two different CBAs—the CBA that defendant suggests was in force from October 22, 2015, to Aril 30, 2018 ("CBA-1"), and a CBA that defendant suggests was effective from May 1, 2018, to April 30, 2021 ("CBA-2")—but fail to explain whether the differences are significant.

2:13-CV-144-PPS, 2016 WL 5939517, at *8 (N.D. Ind. Oct. 12, 2016)—or put another way, "notice of the charges" and "an explanation of the employer's evidence," Carmody, 747 F.3d at 475. Defendant thus must show "that its charges against [plaintiff] are true." Kendall v. Board of Education, 627 F.2d 1, 6 n.6 (6th Cir. 1980) ("To meet its burden, the [defendant] must show that it had just cause for the dismissal, that is, that its charges against [the plaintiff] are true.").

That means that a defendant faces an uphill battle in meeting its burden if it tries to rely on alleged misconduct that it knew about pre-termination and that is not reasonably related to the reason or charge that it would have given at the time. Cf. Tri County Indus. v. Dist. of Columbia, 200 F.3d 836, 842 (D.C. Cir. 2000) (discussing Carey, and rejecting the defendant's suggestion that damages should be nominal where the defendant failed to show that its alternative justification would have led to the same result through the required process); see also Carmody, 747 F.3d at 477 ("Relying on a new charge without providing a meaningful opportunity to respond violates due process.").

Although the court has not located a Seventh Circuit case that directly addresses this notion, it is consistent with the Seventh Circuit's approach in Patterson. The employee there (Patterson) had been a tenured instructor at a college since 1973. Patterson, 853 F.2d at 1401. But he was not successful, and because no students enrolled in his classes in the fall of 1978, the college assigned him to a noninstructional project. Id. He failed to report to work to work on the project, however, and a month later, the college told him that he would be deemed to have resigned unless he reported to work by January 23, 1979. Id. Patterson responded, explaining that he would not show up until the college resolved issues related to his belief that students were complaining about his teaching. Id. at 1401-02. The college thereafter told him that because

he failed to report to work by January 23, it was treating his absence as a resignation. Id. at 1402. The next day, Patterson requested a hearing but was refused. Id. So he filed a § 1983 lawsuit against the college administrators, claiming that they had deprived him of his job without due process, and seeking reinstatement with backpay plus compensatory damages. Id.

Relevant here, the Seventh Circuit explained that, for damages purposes, "[a]ll Patterson lost as a result of the constitutional violation was his salary between the day that [the college] terminated him and the day on which his dismissal would have taken effect had [the college] followed the prescribed procedures." Id. at 1408 (emphasis removed). That was because the college "would have instituted a proceeding to dismiss Patterson and the outcome of that proceeding would have been dismissal." Id. at 1408. Indeed, the court explained, "[h]is inability to attract students to his classes, his insistence on a formal proceeding to resolve nonexistent [student complaints] against him, his refusal to accept substitute employment at his college with no diminution of pay or perquisites and no onerous working conditions—all suggest that the college had cause to dismiss him in 1979." Id. at 1407. Notably, nowhere did the court suggest that the college could meet its burden to show cause for termination by relying on pre-termination conduct that the college knew about but that was not reasonably related to the reason that it gave at the time.

As for reinstatement, the court made clear that the college could rely on evidence at the relevant time (1979), and also on after-the-fact evidence and conduct. According to the court, if Patterson was unfit in 1979, reinstating him would improperly "make him better off than he would be if the college had never violated his rights." Id. at 1408. And as for post-termination conduct, the "appropriateness of" reinstatement "is determined by current rather than past

conditions." Id. So if he was "unfit today," the court observed, "it would be . . . a disservice to the students to reinstate him." Id. In finding reinstatement inappropriate, the court thus relied not only on the for-cause reasons the college had in 1979, but also on the fact that Patterson was currently "an emotional basket case," and was "in his late forties" and had "not worked for the last nine years." Id. at 1407-08.

Other case law, moreover, suggests that evidence of pre-termination misconduct that is unrelated to the reasons given for termination may affect damages and reinstatement where the evidence was discovered only after termination. In a case arising under the ADEA, for example, the Supreme Court adopted an "after-acquired evidence" doctrine—which, when applicable, can limit backpay and reinstatement. McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 362-63 (1995). The McKennon "case c[ame] to [the Court] on the express assumption that an unlawful motive [age] was the sole basis for" Nashville firing McKennon. 513 U.S. at 359. But after McKennon filed her case, Nashville learned at McKennon's deposition that, during her final year of employment with Nashville, she had removed records in violation of her job responsibilities. Id. at 355. In other words, "McKennon's misconduct was not discovered until after she had been fired." Id. at 360. Although the Court concluded that the after-acquired evidence could not be used to avoid liability, it held that the evidence could be used in determining remedies. Id. at 360-63.

According to the Court, when "an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known it at the time of the discharge." Id. at 362-63. If the employer can meet that burden, the "general rule" is

that reinstatement is not "an appropriate remedy." Id. at 361-62. That is because—consistent with Patterson's discussion on reinstatement—"[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." Id. at 362. And as for backpay, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of back pay from the date of the unlawful discharge to the date the new information was discovered." Id. at 362.

So to sum up, a defendant faces an uphill battle to show cause if it tries to rely on alleged misconduct that it knew about pre-termination but that is unrelated to the reasons it would have given at the time of the hearing; but it can rely on after-termination conduct and after-acquired evidence of pre-termination conduct to defeat reinstatement and to limit the timeframe for post-termination backpay so long as it establishes that the conduct would have amounted to cause.

What amounts to "Cause" in this Case

Apart from the timeframe issues, the court must also consider what types of reasons defendant could have relied on to justify firing plaintiff. In granting summary judgment, the court explained that plaintiff had a property interest in his continued employment because, among other things, there was no dispute that Illinois statutes and the CBA "limit the ability of defendant to discharge plaintiff" based on "cause." Hawkins, 2025 WL 875210, at *5; see 65 ILCS 5/10-1-18 ("no officer . . . may be . . . discharged . . . except for cause"); id. at 5/10-2.1-17 ("no officer . . . of the . . . police department of any municipality . . . shall be . . . discharged except for cause"); CBA-1 at § 7.6 ("dismissal of a non-probationary Officer shall occur only for reasonable 'just cause'"); CBA-2 at § 7.5 ("A Sergeant shall only be disciplined for 'just cause'.").

"In Illinois, 'cause' has been judicially defined as some substantial shortcoming which renders the employee's continuance in his office or employment in some way detrimental to the discipline and efficiency of the service." Bodenstab v. Cnty. of Cook, 569 F.3d 651, 662 (7th Cir. 2009) (cleaned up). Or put more plainly: "cause is something that the law and sound public policy recognize as a good reason for the employee to no longer hold [his] position." Bd. of Trs. of Cmty. Coll. Dist. No. 508 v. Migaj, 2023 IL App (1st) 230285, ¶ 40.

For their part, the CBAs explain: that discipline should generally be progressive—from a verbal warning, to a written warning, to suspension, and to dismissal; that discipline should be commensurate with the severity of the offense; and that dismissal can occur as a first step and for a violation of department policy or rules that are in writing and have been made available. See CBA-1 at § 7.5; CBA-2 at § 7.5. That dismissal is authorized (though not required) as a first step based on a violation of department rules accords with Illinois law. See Harder v. Vill. of Forest Park, No. 05 C 5800, 2008 WL 4561631, at *7-9 (N.D. Ill. May 2, 2008) (explaining that "[i]n disciplinary proceedings against a police officer, a single valid finding of a violation of departmental rules will authorize dismissal," but reversing discharge of officer as unreasonable where his "misconduct was not so serious as to warrant termination," he had "more than twenty years of service" (including promotions), and there was a "lack of progressive discipline").

With these principles in mind, the court turns to the defendant's arguments that it had cause to terminate plaintiff.

Whether Defendant Established "Cause"

Defendant argues that it had several reasons to terminate plaintiff for cause:

- Plaintiff was suspended in 2010 and 2011 for "insubordination," was given a written reprimand in 2016 for "being disrespectful to a deputy chief," and again in

2017 for "drafting a criminal complaint with a patrol commander listed within the complaint" and for "not issuing productivity complaints against subordinates."

- Plaintiff "lied about where and when he received treatment by saying he went to Advocate on March 17, 2018, when instead he went to Advocate two days later but was supposed to go to Ingalls."
- Plaintiff "took no steps to ensure that his injury was reported within 24 hours of the injury," he "never report[ed] his injury to Human Resources," and he failed to diligently return to work and notify his employer of his status.
- Plaintiff got "caught up in the ghost-payroll audit," when he failed to pick up his check in May 2019.
- Plaintiff was then "recalcitran[t]" in returning to work, refused to provide medical documentation to HR, and failed to transmit his fit-for-duty exam results.

But the only reason the City put forward for terminating plaintiff at the time it did so (June 2, 2019), was the getting "caught up in the" May 24, 2019 ghost-payroll audit, where plaintiff failed to pick up his paycheck. Indeed, Davis made clear at trial that she knew of only one reason the City had for firing plaintiff—his name was on a list of people who failed to pick up their paycheck on May 24, 2019. Her testimony aligns with the court's findings on the undisputed facts at summary judgment:

> [T]he undisputed facts are that in May 2019, Mayor Clark's administration performed a "ghost payroller audit" to identify workers who were being paid without working, and to check the status of each employee before transferring their records to a new system. From the audit, HR Director Kimble determined that several employees on the list—including plaintiff—were no longer working for the City and should be terminated from the payroll system. Kimble provided the names of those employees to Mayor Clark and City Manager Williams. And at a meeting where Mayor Clark, Williams, and Kimble were present, Mayor Clark approved the termination of plaintiff.

Hawkins, 2025 WL 875210, at *6.

Defendant has identified no evidence that the City had any other reasons in mind at the time it fired plaintiff. So the court will start first with defendant's stated reason for firing plaintiff—his failure to pick up his paycheck pursuant to the ghost-payroll audit.

Whether Plaintiff's Failure to Pick Up a Paycheck Provided Cause

The court finds that defendant has failed to show that the City would have had cause to terminate plaintiff based on the ghost-payroll audit. Davis testified that the audit occurred on May 24, 2019. Plaintiff testified that he was on leave leading up to that time, and it undisputed that he received payment under PEDA through the pay period ending on May 17, 2019. Hawkins, 2025 WL 875210, at *1. Plaintiff also testified that just before the payroll audit, while he was still injured and on leave, he applied for the traffic supervisor position at HPD (which he did not get).

Davis testified that in running the ghost-payroll audit, the City required employees to pick up their checks at city hall. But she could not say whether (and if so, how) the City gave notice to employees that they needed to pick up their checks—including for employees who were out on leave at the time of the audit. She also explained that the audit was not intended to capture individuals on leave, and that while department heads were supposed to vouch for employees under them who were on leave, she did not do any follow-up to see whether anyone who failed to pick up their check was on leave, and did not otherwise reach out to any of the individuals who had not picked up their check. Davis also testified that at time of the audit, the city was in a "state of disarray"—a "total mess" with "files everywhere"—at least in part because the City and police department had just been raided by the FBI.

In short, at the time of the audit: the City was in disarray; the City provided neither formal notice of, nor follow-up on, the payroll audit; the City was not trying to capture individuals on leave; and plaintiff (who had been working for the City for a decade) was on leave and was actively attempting to return to duty. The court therefore finds that defendant has failed

to show that plaintiff's failure to pick up his paycheck in response to the ghost-payroll audit would have given it cause to fire him—that is, that it was such a "substantial shortcoming" that plaintiff should no longer hold his position.

Whether Plaintiff's Alleged "lie" on his Injury-Form Provided Cause

Defendant also argues that plaintiff "lied" about when he received treatment on the "Employee/Supervisor First Report of Injury" form that he filled out on the day of his accident (March 17, 2018). The court finds that defendant has not shown that this would have given the City cause to terminate plaintiff.

For starters, this alleged conduct is not reasonably related to the ghost-payroll charge that the City would have provided to plaintiff at the time. And even if defendant discovered the "lie" only after it terminated plaintiff (defendant does not state precisely when it discovered that plaintiff allegedly lied)—such that backpay could be cut off at that unknown later date—its reliance on the "lie" would fail. That is because defendant has not made its threshold showing that the issue was severe enough to have given it cause to fire plaintiff. See McKennon, 513 U.S. at 362-63 (to rely on after-acquired evidence, the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known it at the time of the discharge").

The form contains the statement: "Did employee seek medical treatment? Yes [or] No." Plaintiff circled "Yes." The form further asks: "If so, who provided treatment?" Plaintiff wrote down "Advocate Medical Beverly." At the hearing, plaintiff conceded that this was incorrect—he in fact did not go to Advocate on the day he filled out and submitted the form, and instead went two days later. When asked why he filled out the form the way he did, he testified

that he could not say what he was thinking at the time, but suggested that it was probably because, if his knee injury ended up being worse than he initially thought, he would go to Advocate (where his primary physician worked) and not Ingalls (where, as he understood things, he would not be accepted as a patient because the City had not been paying Ingalls' bills).

Defendant has not established that plaintiff did in fact lie when he filled out the form. Nor has defendant identified any evidence to suggest that, even if plaintiff had lied about having received treatment at Advocate (and even if he should have gone to Ingalls), such conduct was the kind for which the City discharges officers. See Migaj, 2023 IL App (1st) 230285, ¶ 43 (affirming hearing officer's finding that employee's absence "did not amount to a 'substantial shortcoming,'" noting that the hearing officer "identified the [employer]'s lax enforcement of its policies and disparate treatment between Migaj and another tenured faculty member as reasons for why she believed the [employer] improperly terminated his employment"); see also Harder, 2008 WL 4561631, at *8 ("The record reveals that no other officer had ever been at risk of losing his or her job for" the charged conduct of "swearing at another officer"); id. at *9 (explaining that the officer's lies—including "about his whereabouts during a sick day"—did "not directly relate to [his] public duties as a police officer" or "official police business, and therefore do not warrant termination"). The court finds that defendant has not established that this form-issue amounted to such a substantial shortcoming that plaintiff should no longer hold his position.

Whether Plaintiff's Reporting of his Injury Provided Cause

Defendant contends that plaintiff failed: to ensure that his injury was reported within 24 hours; to otherwise report his injury to HR; and to diligently return back to work and notify his

employer about his status. Defendant does not explain when the city discovered these alleged issues. Regardless, it has not shown that these grounds would have provided cause.

Plaintiff testified that after injuring his knee on March 17, 2018, he returned to the station, filled out the injury form and submitted it to Sergeant Kirkwood (the shift supervisor), who informed plaintiff that he would take over handling the report. See also Hawkins, 2025 WL 875210, at *1. Plaintiff further testified that this was the typical procedure for officers—they fill out the report, give it to a supervisor, and the supervisor would "pass it on." So when he gave Kirkwood the form, he did not think that he had other obligations at that time.

In arguing it would have had cause, defendant points to plaintiff's testimony that he knew that the City maintained an Injury Hotline, that the City's written policies stressed the importance of reporting injuries to HR through the hotline within 24 hours, and that plaintiff was not precluded from reporting his injury.

The court finds that plaintiff's failure to report his injury to HR within 24 hours would not have given the City cause for discharge. The injury policy documents that defendant points to are not particularly clear on who should report injuries to HR. For example, they discuss that the responsibility is on "you and/or your supervisor" and they are often written in a passive voice ("All forms should be submitted to Human Resources"). The "Safety Policy," moreover, notes that "[f]ailure of an employee or supervisor to report work related injuries in a timely matter could result in disciplinary action," and that "[c]ontinued disregard of this policy could result in further disciplinary action, including suspension." (Emphasis added). This contrasts with the Hotline form, which expressly states that "fraudulent claims . . . will result in disciplinary action and possible termination." (Emphasis added). So although the City could theoretically

terminate an employee for violating the reporting policy, the court finds that—based on plaintiff's testimony that in practice the supervisor passes on the forms, based on the Safety Policy's discussion of continuing non-fraud-related violations leading to suspension (not termination), and based on the lack of evidence that this is the kind of issue the City terminates employees for—defendant would not have had cause to fire plaintiff.

As for defendant's argument that he failed to otherwise report to HR, and to diligently return to work or notify his employer about his status, the court finds that this, too, would not have given the City cause for termination. Plaintiff testified that in April 2018, after reporting the injury to Kirkwood, he called into dispatch to report his absences, he discussed his injury with Commander Patterson, and he saw the City's medical provider (Ingalls). He was then placed on leave, he reported frequently to Sergeant Kirkwood about his condition, and he received payment under PEDA through the pay period ending on May 17, 2019. Hawkins, 2025 WL 875210, at *1. His testimony also suggests that as a matter of practice, officers "never went to [HR] for anything. Everything was conducted inside . . . the police station." Plaintiff further testified that even though he was still injured, he tried to return to duty by applying for a traffic supervisor position. And after plaintiff was not selected, plaintiff maintained his contact with Chief Winters and Sergeant Kirkwood, who encouraged his efforts to return to active duty. Hawkins, 2025 WL 875210, at *1.

Ultimately, the failure to report to HR during this time was not after-acquired evidence. Indeed, the City knew of the injury—at least because he was on leave and being paid.[3] And in

[3] Further evidencing that the City knew of his injuries is that the fact that, at some point after plaintiff injured his knee, he filed a workers' compensation claim, which the City disputed and ultimately denied, and which plaintiff thereafter settled with the City for almost $17,000 on July

any event, there is no evidence that, under these circumstances, the City would have disciplined plaintiff by terminating him (and indeed they did not), or that this alleged issue otherwise amounted to a substantial shortcoming.

Whether Plaintiff's Post-Termination Conduct Provided Cause

Defendant also asserts that plaintiff was "recalcitrant[t]" in returning to work after failing to pick up his paycheck, refused to provide medical documentation, and failed to transmit his fit-for-duty exam results. This is not after-acquired evidence; it is after-termination conduct. Indeed, the City had already terminated him as of June 2, 2019, and as explained above, a hearing would have occurred at the latest, by July 2, 2019. Defendant has not explained how this evidence could be relevant to the cause issue—for damages or reinstatement—given that his job no longer even existed. Regardless, the court finds that plaintiff was not recalcitrant.

The record shows: that in July 2019, plaintiff saw his doctor and received a partial release to return to light duty; that he reported this to Sergeant Tibbs; but that Tibbs told him that he could not return to work until he had a full release. See Hawkins, 2025 WL 875210, at *3. Then, in early October 2019, plaintiff met with Chief Winters about his return to work, and he obtained clearance for unrestricted duty from his doctor and provided it to HPD. But he was then told by Sergeant Tibbs that he needed a "fit for duty" certification before he could return to work. Plaintiff testified that Tibbs told him that he would call to schedule the exam. In December 2019, plaintiff reached out to Chief Winters about the fit for duty certification, which plaintiff thereafter received in January 2020. And in February 2020, he was informed that he had been terminated eight months before.

2, 2019. Hawkins, 2025 WL 875210, at *3.

Although plaintiff testified that he had other personal issues going on in that time period, the court finds that he was not recalcitrant in returning to work—much less that his actions would have provided cause for termination.

Whether Plaintiff's Pre-2018 Discipline Provided Cause

Finally, as for plaintiff's suspensions in 2010 and 2011, and his written reprimands in 2016 and 2017, they bear little or no weight at this point. Indeed, these events took place years before the ghost-payroll audit and defendant was in fact promoted to Sergeant after the suspensions. And even if these issues would have provided grounds for termination at the time they occurred, the City already considered them, they are not reasonably connected to the ghost-payroll issue, and they are not after-acquired evidence (because the City knew of them). The court thus finds that his pre-2018 disciplinary record would not have provided cause for termination.

In sum, the court finds that defendant failed to meet its burden to show that plaintiff "would have been terminated even if a proper hearing had been given." Alston, 231 F.3d at 386. The court thus moves on to damages and reinstatement.

**Damages**

Backpay

An employee who seeks lost wages has the initial burden of establishing the amount of damages. Fleming v. Cnty. of Kane, State of Ill., 898 F.2d 553, 560 (7th Cir. 1990). "Once the amount sustained as damages has been established, the burden shifts to the employer to prove, as an affirmative defense, that the employee failed to mitigate those damages." Id. To prove the employee failed to mitigate, "the employer must show that: (1) the plaintiff failed to exercise

reasonable diligence to mitigate his damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." Id. (emphasis removed).

Plaintiff argues that he is entitled to $478,021.64 in backpay through May 23, 2026. According to plaintiff, his lost wages would be $574,074.48 minus the $98,133.44 in wages he earned from other sources, plus $2,080.60 in retroactive raises.

Defendant does not challenge plaintiff's math. It instead contends that backpay is inappropriate because his termination was "justified." But that contention fails for the reasons discussed above for cause. So plaintiff's damages "may include the consequences of the termination, such as lost pay." Nalls v. Bd. of Trs. of Ill. Cmty. Coll. Dist. No. 508, No. 06 C 3595, 2007 WL 1031155, at *5 (N.D. Ill. Mar. 29, 2007); see also Vukadinovich, 2016 WL 5939517, at *8 ("damages for a procedural due process violation can include damages for a termination if there is a causal connection between the termination and the failure to provide a hearing" (citation omitted)).

Defendant also argues that backpay is inappropriate because plaintiff failed to mitigate his damages by not seeking out comparable full-time employment. According to defendant, although plaintiff took on part-time jobs, he testified at the hearing that "the true reason he could not get a full-time position was that he had subsequently injured his right hip and right knee, which means he would not be qualified for full time work for the City either." Thus, defendant concludes, plaintiff "was either lying and not cleared to go back to work for the City and would

not be entitled to backpay, or [he] was perfectly capable of working full time elsewhere as a police officer, but chose not to."

The court finds that defendant has not met its burden to show a failure to mitigate. As for reasonable diligence, a plaintiff "can satisfy the mitigation requirement by demonstrating a continuing commitment to be a member of the work force." Donnelly v. Yellow Freight Sys., Inc., 874 F.2d 402, 411 (7th Cir. 1989). Indeed, "part-time work in another employment field satisfies the mitigation requirement." Id.

Here, plaintiff obtained several part-time jobs. Below is an excerpt from a document plaintiff attached to his brief showing the other sources of income that plaintiff had during the years since he was terminated in February 2020.

| Year | Payor | Amount | Exhibit |
|---|---|---|---|
| 2020 | City of Harvey | $3,621.06 | Pl. Ex. 102 |
| 2021 | Adjusted Gross Income | $32,072.00 | Pl. Ex. 103 |
| 2022 | Village of Phoenix | $15,126.00 | Pl. Ex. 104 |
| 2022 | Armed Security | $1,527.00 | Pl. Ex. 104 |
| 2023 | Village of Phoenix | $17,883.03 | Pl. Ex. 106 |
| 2023 | Protech Security Group | $7,995.00 | Pl. Ex. 105 |
| 2023 | STAN | $726.00 | Pl. Ex. 105 |
| 2024 | Village of Phoenix | $15,823.35 | Pl. Ex. 108 |
| 2024 | Protech Security Group | $3,360.00 | Pl. Ex. 107 |
| 2025 | | $0.00 | |

Plaintiff testified that after he was told that he had been fired in 2020, he started substitute teaching. He then got a part-time job in the Village of Phoenix police department, working 20 hours per week in 2022. And he also worked a part-time job at Protech Security Group and Armed Security.

Yet there is little or no evidence that plaintiff made a good faith attempt to seek comparable full-time work. See Coleman v. Lane, 949 F. Supp. 604, 612 (N.D. Ill. 1996) ("A

discharged employee can satisfy the obligation to mitigate damages despite an unsuccessful search so long as he demonstrates an honest, good faith effort to locate comparable employment." (cleaned up)). He in fact seemed resigned against it, testifying that he was not going to be able "to find full-time work at 60 being a police officer," and that he thought that his "right hip and right knee" were "physically limiting" him from getting a full-time position. He also appears to have not worked at all in 2025.

Nevertheless, defendant has failed to prove the second factor—that there was a reasonable likelihood that plaintiff might have found comparable work by exercising reasonable diligence. Again, plaintiff testified that he thought he was not going to be able "to find full-time work at 60 being a police officer," and he further testified that the jobs he took offered him only part-time work. For its part, defendant provided no evidence that there were any comparable jobs available—no copies of want-ads, no evidence of the specific job qualifications sought by the potential employers and how they compare to plaintiff's skills and background, and no evidence from any potential employer that an application from plaintiff would have resulted in an offer. Coleman, 949 F. Supp. at 614.

Defendant thus has not met its burden on mitigation. See id. (awarding full back pay minus income offsets even though the plaintiff "unjustifiably refrained from pursuing reasonable employment opportunities" because the defendant failed "to provide sufficient evidence that, had [the] Plaintiff made appropriate efforts, he might have actually received job offers"); see also E.E.O.C. v. Gurnee Inn Corp., 914 F.2d 815, 818-19 (7th Cir. 1990) (affirming finding that the defendant failed to show lack of mitigation where the plaintiff produced no evidence on the availability of comparable jobs); see also Stragapede v. City of Evanston, 865 F.3d 861, 868-69

(7th Cir. 2017) ("The plaintiff's backpay award should not be reduced based on failure to mitigate if reasonably diligent effort would not have been likely to produce comparable employment.").

As for defendant's assertion that plaintiff suggested that his hip and knee were "physically limiting" him from getting a full-time position, that might support reducing backpay. But the single question-and-answer at the hearing is not enough for the court to meaningfully determine by how much, and defendant has not made any such reduction-in-backpay argument; it has taken an all or nothing approach.

Finally, the court notes that the parties have not discussed grievance procedures. During the hearing, defendant cross-examined plaintiff about his failure to file a grievance after he stopped receiving a paycheck and realized that something was off (sometime in May-July 2019). But defendant does not mention grievance procedures in its brief, and has thus waived any argument about it. Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017). In any event, because plaintiff had not yet been informed that he was terminated at that time, the court cannot find that he should have filed a grievance then. And indeed, plaintiff testified that he did not seek other work at that time because he "had a job," and that he "figured" he and the City would "straighten out" the paycheck issue "once [he] got . . . back to work."

As for a post-termination grievance, this court noted in its summary judgment order that "[p]laintiff filed a grievance around March 2020 alleging illegal termination, but did not pursue it further after he was informed that he no longer had Union representation for it." Hawkins, 2025 WL 875210, at *3. This issue might have been relevant to whether plaintiff could seek damages and reinstatement after that date. See Glenn v. Newman, 614 F.2d 467, 473 (5th Cir.

1980) ("Because any claim of pretermination due process violations was cured by the subsequent due process hearing, the only damages to which [the plaintiff] is entitled accrued during the period between his dismissal and the date of his post-termination hearing."). But again, defendant has waived any argument about it by failing to address it in its brief. Ennin, 878 F.3d at 595.

The court thus finds that plaintiff is entitled to $478,021.64 in backpay through May 23, 2026.

Repayment of Leave

Plaintiff also seeks $80,581.40 in damages for the leave he would have accrued had he remained with the HPD. According to plaintiff, the amount is based on section 11.1 of the CBA-1, which requires that full-time sergeants receive 20 vacation days annually for 10 to 14 years of service, and 25 vacation days annually for 15 to 19 years of service. Defendant does not challenge this amount. Given this, and because an employee cannot retroactively take vacation time for years after which they were fired, the court finds that plaintiff is entitled to these damages.

Plaintiff further seeks $114,373.60 in damages for the City applying plaintiff's accrued paid sick leave (200 days), holiday leave (19 days), and personal time (1 day) "to his absence from April 5, 2018, through November 28, 2018, despite paying him through PEDA." Defendant contends that plaintiff is not entitled to this money because plaintiff's only evidence of this is plaintiff's Exhibit 10—a calendar schedule for plaintiff—which defendant objects to on hearsay and foundation grounds. The court admitted the document into evidence over

defendant's objection at the trial, explaining that the document was an official business record, which is a hearsay exception.

Defendant has not persuaded the court that it was wrong to do so. Indeed, defendant produced the document during discovery, identified it in its response to plaintiff's interrogatory asking about forfeiture of leave days (Dkt. 139-18), and did not object to it being on the plaintiff's exhibit list. The court finds that it has been properly authenticated, that it is non-hearsay under Fed. R. Evid. 801(d)(2), and that it was properly admitted. Because, as explained further below, the plaintiff should be reinstated, the court finds that the leave days the City applied from April 5, 2018, through November 28, 2018, should be restored.

Emotional Distress

Plaintiff also seeks $350,000 in damages for emotional distress. When, as here, "the injured party provides the only evidence of emotional distress, he must reasonably and sufficiently explain the circumstances of the injury rather than relying on mere conclusory statements." Alston, 231 F.3d at 388. He also must "show 'demonstrable emotional distress,' not just point to circumstances of the constitutional violation which might support an inference of such injury." Id. (cleaned up). The Seventh Circuit has "held insufficient statements by a plaintiff that he is depressed, a little despondent, or even completely humiliated." Id. (cleaned up). Yet "the sufficiency of such statements ultimately depends upon the particular facts of the case." Id. To that end, "an injured person's testimony may, by itself or in conjunction with the circumstances of a given case, be sufficient to establish emotional distress without more." Id. For example, "[t]he more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action." Id.

(citation omitted). So "somewhat more conclusory evidence of emotional distress will be acceptable to support an award of emotional distress." Id. (citation omitted).

The court finds that plaintiff is entitled to damages for emotional distress, but that $350,000 would be excessive. Plaintiff's evidence is somewhat conclusory. He testified that upon learning he was fired, he was "hurt."[4] Although he testified that he did not "want to go back to that time because" he did not "want to be up [on the witness stand] crying and angry," he could say that "it was a different feeling to walk into where you think your job is and be told that you've been fired months ago." It was, he went on, "difficult" and "a bad feeling" being an "older black man with no job" and being "crapped on for being a good policeman." He also testified that he saw a news article that listed Southside police officers who had been fired, and his name was included on the list. He interpreted the list to be suggesting that he was fired for cause, and he testified that it "felt bad" to see his name on the list. This is all fairly conclusory.

At the same time, though, the City's conduct was inherently degrading and humiliating. Plaintiff was fired without any notice and was not told about it for eight months. And all the while, he was discussing with his department and the City's HR department about returning to work—yet no one told him he had been surreptitiously fired months before. Had the City provided pretermination due process, this would not have happened and he would have still had his job. "Because he had worked for the same employer for so many years, it is plausible that he would have been deeply distressed by what he regarded . . . as an unjustified and unjust discharge" after receiving no notice or hearing. Avitia v. Metro. Club of Chicago, Inc., 49 F.3d

---

[4] The court notes that in plaintiff's opening brief, he purports to quote his own testimony from the trial transcript related to his emotional distress. But the quoted material does not actually appear to be in the transcript. The court cautions plaintiff to be more careful in future filings.

1219, 1229 (7th Cir. 1995). The court finds that plaintiff is thus entitled to damages for emotional distress.

But $350,000 "is too much." Id. "Judges . . . must not be casual with other people's money." Id. ("conclud[ing] that a remittitur of $10,500 in damages for emotional distress (half the award)" for being terminated "is necessary to keep the award of these damages within the limits of the rational"). That includes the taxpayer's money. The court finds that an award of $35,000 in damages for emotional distress is rational and warranted here. See U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1286 (7th Cir. 1995) (explaining that the Seventh Circuit in 1987 had surveyed cases and found that cases "upholding damages for claims under 42 U.S.C. § 1983 resulting from illegitimate firings ranged from a low of $500 to a high of over $50,000," and noting that "the current value of those awards is considerably greater" and that "[c]omparability of awards must be adjusted for the changing value of money over time" (citation omitted)).

**Reinstatement**

Finally, plaintiff argues that he is entitled to reinstatement "to the rank of Sergeant with full seniority and all attendant benefits." The court agrees.

"An individual who is unconstitutionally deprived of his employment is presumptively entitled to reinstatement." Coleman v. Lane, No. 92 C 2726, 1994 WL 171446, at *1 (N.D. Ill. May 2, 1994); see also Gaddy v. Abex Corp., 884 F.2d 312, 319 (7th Cir. 1989) ("Reinstatement with the defendant employer is warranted absent exceptional circumstances demonstrating that the position is no longer available or where a continued reduction in forces occurs.").

As discussed above, defendant failed to prove that plaintiff would have been fired even if a proper hearing had been given, or to otherwise show that plaintiff's pre-termination conduct amounted to cause. Defendant suggests that his "repeated insubordination" weighs against reinstatement. But again, as explained above, defendant failed to establish that those events—which occurred years before his firing in 2019—would have led to the City terminating plaintiff. Reinstatement is thus not off the table based on any pre-termination cause. Compare Patterson, 853 F.2d at 1407 (explaining that an order reinstating the plaintiff would not have been a proper remedy because, "[a]lthough his procedural rights were violated, there is little doubt that he was unfit" at the time he was terminated).

As for post-termination conduct, current conditions bear on the appropriateness of reinstatement. Id. at 1408. So if defendant can show that plaintiff is unfit today, it would be inappropriate to reinstate him. Id. But defendant has not made this showing.

Since his termination, plaintiff has generally been working (albeit part-time) in police- and security-related jobs. While defendant pointed out in arguing against backpay that plaintiff suggested that his "right hip and right knee" were "physically limiting" him from getting a full-time position, defendant has not attempted to show that he would be physically unable to fulfill his prior duties with the City.

Defendant's sole contention is instead that reinstatement is infeasible because the "well of goodwill between the parties here has been polluted" and because there was, and "still exists," "genuine bad blood" between the parties. But defendant identifies no evidentiary support for its contention that anyone at the City actually believes this. And even if it had provided support, defendant "cannot use its own anger at the employee" it fired without due process "to oppose

reinstatement." Avitia, 49 F.3d at 1231. Nor can it rely on anger based on the litigation: "hostility common to litigation should not become an excuse to avoid ordering reinstatement on a general basis." U.S. E.E.O.C. v. Century Broad. Corp., 957 F.2d 1446, 1462 (7th Cir. 1992) (cleaned up).

Defendant's reliance on plaintiff's testimony about feeling hurt after the City fired him is also misplaced. Putting aside that his feeling hurt was entirely expected, nothing he said at the trial suggested that his anger is so strong today that it would create problems if he returned. And indeed, he wants to return to the City and, as plaintiff notes, defendant presented no testimony from any current HPD supervisor or coworker that reinstatement would disrupt the department, endanger the public, or be administratively unworkable.

Suffice to say, this is simply not a case in which "the relationship between [the parties] was so poisoned, and the poison so harmful to the [City's and the public's] legitimate concerns, as to make reinstatement an inappropriate remedy." Avitia, 49 F.3d at 1231.

The court finds that plaintiff is entitled to reinstatement to the rank of Sergeant with full seniority and all attendant benefits, and to additional back pay for the time from May 23, 2026, to the date of reinstatement.

## CONCLUSIONS

For the reasons above, the court finds that:

- defendant failed to meet its burden to show that plaintiff would have been terminated even if a proper hearing had been given;
- plaintiff is entitled to $478,021.64 in backpay through May 23, 2026;
- plaintiff is entitled to $80,581.40 in damages for the leave he would have accrued had he remained with the HPD;
- plaintiff is entitled to $35,000 in damages for emotional distress; and

- plaintiff is entitled to reinstatement to the rank of Sergeant with full seniority and all attendant benefits, to additional back pay for the time from May 23, 2026, to the date of reinstatement, and to restoration of the leave days that the City applied from April 5, 2018, through November 28, 2018.

The parties are directed to file a joint status report by October 29, 2026, explaining whether any issue is left in this case.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: October 14, 2026**